271 N.J. Super. 88 (1994)
638 A.2d 141
JOANNE STRAWN, GERALD L. STRAWN, TRACEY A. STRAWN AND BRANDON M. STRAWN, BY THEIR GUARDIAN AD LITEM, JOANNE STRAWN, RUSSELL C. BURTON AND BRETT C. BURTON, BY HIS GUARDIAN AD LITEM, RUSSELL C. BURTON, WILLIAM HELBLING, ANTHONY ALVAREZ, RITA ALVAREZ, LISA ALVAREZ, JOHN M. GAVEN, SR., ANNETTE M. GAVEN, AND JOHN M. GAVEN, JR., YOUNG D. KIM, JULIA S. KIM, AND PATRICK KIM AND ROY KIM BY THEIR GUARDIAN AD LITEM, YOUNG KIM, ALBERT WILLIAMS, EVELYN WILLIAMS, AND STEPHEN WILLIAMS, PLAINTIFFS-APPELLANTS, CROSS-RESPONDENTS, AND MARIE C. INCOLLINGO, ANTHONY F. INCOLLINGO, MICHELLE M. INCOLLINGO, NANCY ANN INCOLLINGO, FRANK CARNOT, RAEFFAELA CARNOT, WILLIAM DENNIS, JACQUELINE DENNIS, NICOLE M. DENNIS AND FARRAH D. DENNIS, BY THEIR GUARDIAN AD LITEM, JACQUELINE DENNIS, MICHAEL POWELL, AMY POWELL AND MOLLY POWELL, BY THEIR GUARDIAN AD LITEM, DOROTHY POWELL, MICHAEL J. VITARELLI, SR., LOIS A. VITARELLI AND JACQUELINE VITARELLI, LESLIE VITARELLI, MICHAEL VITARELLI, JR., BY THEIR GUARDIAN AD LITEM LOIS VITARELLI, CHRISTOPHER CONTI, ELAYNE CONTI, DANA MARIE CONTI AND GINA CHRISTINE CONTI, BY THEIR GUARDIAN AD LITEM ELAYNE CONTI, EUGENE E. JARON, ANN T. JARON, KATHLEEN A. JARON, STEPHEN M. JARON, PAUL M. KRAMER, PATRICIA G. KRAMER, BY THEIR GUARDIAN AD LITEM PATRICIA KRAMER, SANDY OBLENA, ESTRELLA OBLENA, NATHANIEL OBLENA, AND MICHAEL OBLENA BY THEIR GUARDIAN AD LITEM SANDY OBLENA, ANTHONY CHAPMAN, CATHARINE CHAPMAN, DAVID CHAPMAN AND ADRIANE CHAPMAN BY THEIR GUARDIAN AD LITEM CATHARINE CHAPMAN, JAY AGNES, JACQUELINE AGNES, ROBERT LEWIS, CELINE LEWIS, AND STEPHANIE LEWIS, BY HER GUARDIAN AD LITEM ROBERT LEWIS, TRUDY BECMER, EDMUND BECMER, DEBRA MURACA, FRANK MURACA, DAVID BARD, RUTH BARD, HOWARD FRIEDMAN, MARIANO A. PINIZZOTTO, AND MARIE ROSE PINIZZOTTO BY HER GUARDIAN AD LITEM MARIANO A. PINIZZOTTO, CHESTER A. RIDDICK, JR., CARMELITA D. RIDDICK, TODD RIDDICK, AND ALLEN RIDDICK, BY HER GUARDIAN AD LITEM CARMELITA D. RIDDICK, MARTIN V. GOLDSTEIN, PATRICIA M. CORSON, FREDERICK E. CHINK, MARIA P. CHINK, BY HER GUARDIAN AD LITEM FREDERICK E. CHINK, RICHARD J. NELSON AND MARY ANN NELSON, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, PLAINTIFFS,
v.
JOHN B. CANUSO, SR., JOHN B. CANUSO, JR., CANETIC CORPORATION AND CANUSO MANAGEMENT CORPORATION, DEFENDANTS-RESPONDENTS, AND FOX & LAZO INC., DEFENDANTS-RESPONDENTS, CROSS-APPELLANTS, AND JOCAN, INC., WEICHERT REALTORS, JOHN DOE (ONE) THROUGH JOHN DOE (TWENTY) AND DOE CORPORATION (ONE) THROUGH DOE CORPORATION (TWENTY), DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued December 6, 1993.
Decided February 22, 1994.
*93 Before Judges COLEMAN, THOMAS and LEVY.
Mark R. Rosen argued the cause for appellants (Mesirov, Gelman, Jaffe, Cramer & Jamieson, and Williams, Cuker & Casper, attorneys; Mr. Rosen, Mark R. Cuker and Alan H. Casper, of counsel, and on the brief).
Alan Greenberg argued the cause for defendants-respondents (Rawle & Henderson, attorneys; Mr. Greenberg, Tina L. Nugent and Joanne Stipick, of counsel; Ms. Nugent and Ms. Stipick, on the brief).
Gregory R. McCloskey argued the cause for defendant-respondent, cross-appellant Fox & Lazo Inc. Realtors (Begley, McCloskey & Gaskill, attorneys; Mr. McCloskey and David E. Ewan, on the brief).
The opinion of the court was delivered by COLEMAN, P.J.A.D.
*94 The crucial and novel issues raised in this class action litigation are whether (1) a builder and selling brokers of new homes have a duty to disclose to potential buyers the existence of a nearby closed landfill, (2) consumer fraud claims should be tried before a jury, and (3) class action certification should have been granted. We conclude that under the circumstances, a duty to disclose exists and class action certification should have been granted. An advisory jury should try the consumer fraud claims.
On May 5, 1987, plaintiffs filed a class action complaint on behalf of between 150 and 200 families who purchased homes in Voorhees Township, Camden County, near a closed landfill. The homes are located in a development known as the Woods of Voorhees and Las Brisas, which is an extension of the Alluvium development. The complaint alleges, among other things, that the market value of the homes was diminished at the time of purchase due to their close proximity to the closed Buzby Landfill, suspected of containing toxic waste. The complaint also alleges common law fraud, negligent misrepresentations and concealment, and violations of the New Jersey Consumer Fraud Act.
Defendants-respondents John B. Canuso, Sr., John B. Canuso, Jr., two officers of Canuso Management Corporation, and Canetic Corporation, were the builders of the homes. Canetic Corporation also marketed the homes during 1984 and early 1985. Defendant-respondent Fox & Lazo, Inc. Realtors was the selling broker from early 1985 through August 1, 1986. Thereafter, the homes were marketed by defendant Weichert Realtors through 1987.
Although plaintiffs filed a motion for class action certification on October 16, 1987, the decision denying the motion was not rendered until March 5, 1991, followed by an order entered on July 16, 1991. The same application was denied again in 1992. Eventually, the judge granted summary judgments dismissing all claims of seven families: Alvarez, Burton, Gaven, Helbling, Kim, Strawn and Williams. The judge also ruled that all claims of each plaintiff-family should be severed from the claims of all other *95 plaintiffs and the remaining nineteen plaintiff-families awaiting trials on common law fraud and Consumer Fraud Act claims are entitled to jury trials on both claims. The seven plaintiff-families whose cases have been dismissed entirely have appealed, and defendant Fox & Lazo has cross-appealed from the order which permits a jury trial on the Consumer Fraud Act claims.

I Factual Assertions

A. Advertisements for the Homes.
The homes involved in this protracted litigation were constructed in the early to mid 1980's near the eastern boundary of a 56 acre landfill known as the Buzby Landfill. The gravamen of the litigation requires us to focus on whether any reasonable basis existed to require defendants to disclose the existence of the landfill. Since appellants' complaint was dismissed on summary judgment motions, we must examine the facts in a light most favorable to the plaintiffs. Ruvolo v. American Cas. Co., 39 N.J. 490, 499, 189 A.2d 204 (1963).
None of the plaintiff-appellant families knew about the existence of the landfill at the time they purchased their homes. Defendant Canuso, Sr., on the other hand, allegedly knew about the landfill while it was still operational and before the homes were built. Defendants utilized sales promotion brochures, newspaper advertisements and a fact sheet to sell the homes. The brochures described the Woods of Voorhees as follows: "Here you can own an exciting John B. Canuso home in the midst of a heavily treed forest." A brochure for Las Brisas stated it was a continuation of the 600 acre Alluvium development of "large gracious homes in harmony with the gently rolling, wooded terrain.... The sense of tranquility, of unity, of harmony with nature transcends the desire to succeed. Bold fresh designs coupled with the enhancing of the environment by preserving and unifying the inherent beauty of the forest, make Alluvium a community, not just an address. And now the bold dream continues with Las Brisas." Some of the plaintiffs allege that one of the brochures stated the residents *96 could go "hiking in the woods." We have not been able to locate a legible copy of this statement in the appendix.
During the spring of 1985, the Philadelphia Inquirer newspaper carried an advertisement for the Woods which depicted two children running toward a home. A caption in bold print stated "Daddy's Home." Underneath the caption, the following appeared: "You can enjoy the contentment and satisfaction of knowing your children are growing in the healthy, fresh, country air of this ideal wooded community." The brochures emphasized the existence of off-site amenities such as country clubs and shopping malls. However, neither the brochures, the newspaper advertisements nor any sales personnel mentioned that a landfill is located within half a mile of some of the homes. Each appellant-family asserts that it relied upon the brochures and the advertisements in purchasing its home.

B. The Buzby Landfill.
The land used for the landfill was owned by RCA and Voorhees Township. The landfill was operated between 1972 and 1978 by the Buzby Brothers. The landfill was primarily used as a dumping ground for vegetative waste, municipal refuse, liquid septage and solid waste. Despite the stated purposes, there is evidence that it was also used for the disposal of chemical waste. A hazardous waste site investigation conducted by the federal Environmental Protection Agency (EPA) in May 1980 is part of the evidence plaintiffs rely upon to establish the presence of hazardous waste in the landfill.
This EPA report contains the assertion that RCA, which owned other property adjacent to the eastern end of the landfill, intended to build a number of homes on this eighty-five acre tract, each with its own well for drinking water. The author commented that "[h]omes constructed so close to a landfill that accepted industrial waste is poor planning. The potential for a future Love Canal exists at this site."
*97 Although the landfill was not registered to accept chemical industrial waste, the New Jersey Department of Environmental Protection and Energy (NJDEPE) received reports from people who had seen tankers of chemicals dumping their loads there. Indeed, a 1979 aerial photograph of one area of the RCA-owned portion appeared to show twenty to thirty unidentified fifty-five gallon drums at the site. Furthermore, the Buzby Brothers wrote letters dated May 1971 and March 1972 to RCA indicating their objection to the delivery of industrial chemicals to the landfill for dumping. The Buzby Brothers were fined in 1977 for unspecified violations.
Additionally, the record contains a number of memoranda from various NJDEPE divisions and the EPA concerning the environmental status of the Buzby Landfill. In 1981 the NJDEPE formulated an "Emergency Action Plan" to clean up the Buzby Landfill site. That document noted that "[t]he type and volume of waste disposal in the landfill is unknown. Disposal of industrial waste at the site is reported by the New Jersey Department of Environmental Protection." Sampling of the surface water and lake sediments from two nearby lakes revealed "trace" levels of heavy metals and organic pollutants. The same "trace" levels were found in groundwater well samplings. The contamination levels of the soil were unknown, as were the extent of off-site gas migration and the hazard of leachate infiltration. Air, water and soil monitoring was recommended and housing developments were cautioned not to have groundwater wells until water safety had been established.
In March 1983 Steven Croce, a Site Manager of the NJDEPE's Bureau of Site Management, visited the landfill and "the property owned by the Alluvium Development Company (southeast of the landfill property)." He did not see or smell contamination on the lake which was part of the Alluvium development, even though sampling of the lake water in 1980 showed high metal concentration in the lake sediment.
*98 Another site visit in May 1984, however, revealed gas leaks in the RCA gas venting system at the landfill, and "a steady stream of liquid flowing into the nearby marsh area and down stream lakes" off the southern face of the Voorhees Township portion of the landfill.
In January 1985 the landfill was visited again by officials from the NJDEPE Water Resources Division. They observed leachate seeping from the RCA portion of the landfill into one of the downstream lakes. This seepage took the form of "a thick black liquid" or "orange colored with an oily, scummy surface." Immediate sampling of the lakes for pollutants was recommended "[d]ue to the possibility of severe contamination of these lakes, and the new housing development[s]."
The Mayor of Voorhees Township was advised by the NJDEPE in a letter dated September 8, 1985, that groundwater, sediment and surface water samples from the landfill and downgradient lakes southeast of the site indicated the presence of hazardous waste constituents in the groundwater and marsh sediments; additional sampling would be done. The NJDEPE cautioned: "It would be appropriate to advise any prospective home buyers (for the area near the landfill) who contact your office that investigations are underway and will continue to determine levels of contamination, the source(s) of the contamination, and any health/environmental impacts related to contaminated zones."
On September 3, 1986, two investigators from the NJDEPE and two from the Camden County Health Department did a methane gas migration survey around the perimeter of the landfill. They found methane gas migration as far as 100 feet away from the landfill's fence. This placed the gas in the backyards of some of the proposed or built homes. They suggested that repair of the faulty RCA gas venting system which was not expected to be accomplished until December 1987.
In August 1991 the U.S. Department of Health and Human Services, Public Health Service Agency for Toxic Substances and Disease Registry (ATSDR), filed a "Health Assessment" for the *99 Buzby Landfill. This report noted that "[a] residential area was constructed near the eastern boundary of the landfill in the mid 1980s, after the U.S. Environmental Protection Agency (EPA) recommended that the area not be developed for residences." It also noted that a "stream containing hazardous substances discharging from the landfill runs through several back yards in the residential area."
After residents of the area experienced various medical conditions which they associated with hazardous substances in the landfill, they petitioned the ATSDR to perform a health assessment. The ATSDR completed this health assessment and filed a detailed report documenting the contaminants emanating from the landfill and evaluating the residents' medical complaints in light of the existence of those contaminants. The ultimate conclusion reached by the ATSDR was "that the Buzby Brothers Landfill poses an indeterminate public health hazard." It also recommended that the EPA evaluate the releases of contaminants from the landfill under the Hazard Ranking System of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C.A. §§ 9601 et seq., more commonly called the Superfund legislation, to determine whether the site should be placed on the National Priorities List.
In view of the foregoing information, it is clear that the Buzby Landfill was suspected of containing hazardous waste. A landfill can pose serious threats to health and the quality of life. Ayers v. Jackson Township, 106 N.J. 557, 525 A.2d 287 (1987). The above data and additional evidence plaintiffs can introduce are sufficient to permit a jury to reasonably find that before the homes were sold to the plaintiffs, the developers knew or should have known of the existence of the landfill and that it might reasonably contain hazardous waste. In addition, when the New Jersey Real Estate Commission became aware that homes were going to be built near a potential hazardous waste site, it made known its requirements of full disclosure by selling brokers. Thus, on December 14, 1983, the Real Estate Commission wrote to the Camden County Board *100 of Realtors, stating that "[b]ecause of the potential effects on health, and because of its impact on the value of property, location of property near a hazardous waste site is a bit of information that should be supplied to potential buyers. Difficulties in selling such property should be disclosed to potential sellers."

II Duty

The judge granted summary judgments dismissing all claims of the appellants because he found the defendants had no duty, as developers of homes and as real estate sellers and brokers, to disclose the existence of the off-tract landfill to plaintiffs as prospective purchasers. "Before recovery may be had, a duty must exist in law and a failure in that duty must be proved as a fact." Mergel v. Colgate-Palmolive-Peet Co., 41 N.J. Super. 372, 379, 125 A.2d 292 (App.Div.), certif. denied, 22 N.J. 453, 126 A.2d 392 (1956). Whether a duty exists is a matter of law to be decided by the court, not the jury. Wang v. Allstate Ins. Co., 125 N.J. 2, 15, 592 A.2d 527 (1991); Essex v. New Jersey Bell Telephone Co., 166 N.J. Super. 124, 127, 399 A.2d 300 (App.Div. 1979); McKinley v. Slenderella Systems of Camden, N.J., Inc., 63 N.J. Super. 571, 581, 165 A.2d 207 (App.Div. 1960); McIntosh v. Milano, 168 N.J. Super. 466, 495, 403 A.2d 500 (Law Div. 1979). In the final analysis, it is "largely a question of fairness or policy." Wang v. Allstate Ins. Co., supra; Strachan v. John F. Kennedy Mem. Hosp., 109 N.J. 523, 529, 538 A.2d 346 (1988). "The inquiry involves a weighing of the relationship of the parties ... and the public interest in the proposed solution." Kelly v. Gwinell, 96 N.J. 538, 544, 476 A.2d 1219 (1984).
Although "our law has progressed more slowly in the real property field than in other fields," we have finally reached the point where the focus is now on the "modern concepts of justice and fair dealing." Weintraub v. Krobatsch, 64 N.J. 445, 456, 317 A.2d 68 (1974). Even in the field of real property, our law should be based on current notions of what is "right and just." Ibid; Schipper v. Levitt & Sons, Inc., 44 N.J. 70, 90, 207 A.2d 314 (1965). The modern concept of justice and fair dealing has *101 persuaded us in the past to conclude "that purposeful concealment can be as destructive as an affirmative false statement." Correa v. Maggiore, 196 N.J. Super. 273, 281, 482 A.2d 192 (App.Div. 1984). Consistent with the doctrine of justice and fair dealing, caveat emptor, which is part of our common law, can no longer be immutable or inflexible in certain circumstances. One of the great virtues of our common law is "its dynamic nature that makes it adaptable to the requirements of society at the time of its application in court." State v. Culver, 23 N.J. 495, 505, 129 A.2d 715, cert. denied sub nom., Culver v. New Jersey, 354 U.S. 925, 77 S.Ct. 1387, 1 L.Ed.2d 1441 (1957). Application of caveat emptor in the present case would work an injustice. Weintraub v. Krobatsch, supra, 64 N.J. at 456, 317 A.2d 68.
To date, no reported New Jersey appellate decision has imposed a duty upon sellers or brokers of homes to require disclosure of the existence of off-site conditions which might reasonably affect the value or enjoyment of the property listed for sale. But for over three-quarters of a century, our courts have sustained a cause of action for affirmative fraudulent misrepresentations by sellers and their agents to buyers respecting off-site conditions which affect the value of land involved in the transaction. Roberts v. James, 83 N.J.L. 492, 493-94, 85 A. 244 (E. & A. 1912) (involving misrepresentation about the nature of the development in which the lots sold to the purchaser were located rather than about the lots the purchaser bought); Curtiss-Warner Corp. v. Thirkettle, 101 N.J. Eq. 279, 280, 137 A. 408 (E. & A. 1927) (involving a misrepresentation about the existence of a paper street, not the lot the purchaser bought); Landriani v. Lake Mohawk Country Club, 26 N.J. Super. 157, 160-61, 97 A.2d 511 (App.Div. 1953) (involving a misrepresentation that the purchase of a lakefront cottage would make the purchaser eligible for membership in a country club). The bulk of this appeal, however, deals with nondisclosure of a landfill since affirmative misrepresentations respecting landfills were allegedly made to only two of the plaintiffs.
*102 Tobin v. Paparone Const. Co., 137 N.J. Super. 518, 349 A.2d 574 (Law Div. 1975) is somewhat analogous to the present case. There, a residential home developer failed to disclose to a purchaser that an adjoining lot owner intended to construct a tennis court with a ten-foot high fence within one foot of the common boundary line. Relying on the Weintraub doctrine of justice and fair dealing, the court found the developer's "silence was a fraudulent representation and a failure of an implicit condition of sale." Id. at 526, 349 A.2d 574. Unlike the holding in Capano v. Borough of Stone Harbor, 530 F. Supp. 1254, 1263 (D.N.J. 1982), we do not read Tobin to be limited to situations in which a developer makes false verbal representations about the environment surrounding the premises involved in a particular transaction.
The Restatement (Second) of Torts § 551 (1977), has also acknowledged the trend toward a more frequent recognition of the duty to disclose under certain circumstances. Subsection (1) of Restatement § 551 sets out the traditional rule requiring disclosure of a fact which the individual knows may justifiably induce another to act, or refrain from acting, in a business transaction, only if the individual is under a duty to the other to exercise reasonable care to disclose the matter. However, subsection (2) sets out the conditions under which an individual has a duty to use reasonable care to disclose certain information. Subsection (2)(e) of § 551 imposes a duty upon a party to a transaction to disclose to the other "facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts."
Comment 1 to § 551 acknowledges the difficulty in being specific about the factors which could give rise to an expectation of disclosure. The comment observes that generally § 551(2)(e) has been applied where the advantage taken of the plaintiff's ignorance is "so shocking to the ethical sense of the community, and is so extreme and unfair, as to amount to a form of swindling, in *103 which the plaintiff is led by appearances into a bargain that is a trap, of whose essence and substance he is unaware." However, the comment goes on to caution that "[t]here are indications, also, that with changing ethical attitudes in many fields of modern business, the concept of facts basic to the transaction may be expanding and the duty to use reasonable care to disclose the facts may be increasing somewhat. This Subsection is not intended to impede that development." We are persuaded that § 551(2)(e) provides substantial support for our determination that both the seller and the broker had a duty to disclose the existence of the landfill.
Other states have also imposed a duty of disclosure on sellers and brokers. Notably among them is California which requires real estate brokers, agents and sellers to disclose to purchasers facts known to the broker, agent or seller respecting off-site conditions, which are unknown to the buyer, that materially affect the value or the desirability of the property listed for sale. This legal obligation has been described as a duty to disclose those circumstances or conditions which "can reasonably be said to have a foreseeably depressing affect on the value of property...." Alexander v. McKnight, 7 Cal. App.4th 973, 9 Cal. Rptr.2d 453, 456 (1992); Easton v. Strassburger, 152 Cal. App.3d 90, 199 Cal. Rptr. 383 (1984); Reed v. King, 145 Cal. App.3d 261, 193 Cal. Rptr. 130 (1983); Cooper v. Jevne, 56 Cal. App.3d 860, 128 Cal. Rptr. 724, 727 (1976).
Similarly, two other states have imposed a duty upon sellers of realty to disclose the existence of off-site conditions which negatively impact the transaction. O'Leary v. Industrial Park Corp., 14 Conn. App. 425, 542 A.2d 333, 336 (1988), held the seller of land was liable for fraudulent non-disclosure because the seller did not inform the buyer that the land was located too close to a town well to obtain a permit to use the property for its intended purpose, the construction of a herbicide storage facility. "The failure to disclose known facts and a request or a circumstance which *104 imposes a duty to speak, forms the essence of fraudulent misrepresentation." Id. 542 A.2d at 337.
Saslow v. Novick, 19 Misc.2d 712, 191 N.Y.S.2d 645, 647-49 (Sup.Ct. 1959), held that the seller of a cigar, stationery and confection store had a duty to disclose to the buyer that the New York City Transit Authority was attempting to eliminate the subway station which was immediately adjacent to the store, the source of most of the customers for the store. The court rejected the seller's claim that the purchaser had a duty to investigate and make his own evaluation from the public records and concluded the buyer had a right to rely on the seller's implied assertion that the business would continue.
Finally, Coral Gables, Inc. v. Mayer, 241 A.D. 340, 271 N.Y.S. 662, 664 (1934), held that the seller of lots had a duty to disclose to the purchasers the proximity of the lots to an obnoxious business development. The failure to disclose was regarded as fraudulent.
Consistent with Weintraub, supra; Tobin, supra, § 551(2)(e) of the Restatement and the out-of-state decisions, we conclude that the developer-seller of residential housing in multi-home developments and their agents, have a duty to disclose the existence of off-site conditions, which (1) are unknown to the buyers, (2) are known or should have been known to the seller and/or its broker, and (3) based on reasonable foreseeability, might materially affect the value or the desirability of the property involved in the transaction. Since the brokers are agents of the seller, their duty to the purchasers is at least coextensive with that of the seller.
Imposition of this duty comports with modern notions of justice, fair dealing and sound public policy of protecting home buyers in large developments who have limited bargaining power. They also tend to rely on the seller's and broker's knowledge concerning factors affecting the market value. Where, as here, a duty to speak exists, the failure to speak constitutes unfair conduct likely to cause harm. See Keeton, "Fraud  Concealment and *105 Non-Disclosure," 15 Tex.L.Rev. 1, 31 (1936). Nondisclosure of a material fact where there is a duty to speak is fraudulent concealment based on suppression of truth, and is equivalent to an expression of a falsehood. Bonnco Petrol, Inc. v. Epstein, 115 N.J. 599, 610, 560 A.2d 655 (1989); Jewish Center of Sussex Cty. v. Whale, 165 N.J. Super. 84, 89, 397 A.2d 712 (Ch.Div. 1978), aff'd o.b., 172 N.J. Super. 165, 411 A.2d 475 (1980), aff'd, 86 N.J. 619, 432 A.2d 521 (1981). See also Ollerman v. O'Rourke Co., Inc., 94 Wis.2d 17, 288 N.W.2d 95, 106-07 (1980). Consequently, the nondisclosure involved here is to be treated the same as an affirmative false statement insofar as claims for compensatory damages are concerned.
There is yet another reason supporting the finding of a duty to disclose in this case. Even where no duty to speak exists, one who elects to speak must tell the truth when it is apparent that another may reasonably rely on the statements made. Tobin, supra, 137 N.J. Super. at 525-29, 349 A.2d 574. Here, the developer and broker chose to utilize the environment beyond the boundary lines of the developments to sell or enhance the saleability of the homes. The brochures and advertisements made the environment and off-site properties relevant to each sale by stating that the area was safe to go "hiking in the woods," that children could grow up in the "healthy, fresh, country air" and that country clubs and shopping malls were nearby. Having elected to use the off-site environment to induce sales, the seller and broker were obligated to disclose the existence of a landfill which could have a substantial negative impact upon the value of the homes and the quality of life in the area. Plaintiffs assert that they relied upon the developer and its agents' representations as to the character of the area and the general environment. They allege that concealment of the existence of the landfill materially affected their decision to purchase as well as the price they paid. Indeed, during the first six months of 1987, at least twenty-three potential home buyers canceled their offers to purchase when they learned that a landfill was located nearby.
*106 We reject defendants' claim that plaintiffs should be charged with constructive knowledge of the landfill because its existence was so open and notorious. We agree with the observation made in O'Leary v. Industrial Park, supra, 542 A.2d at 337, that the doctrine of constructive knowledge cannot "serve as a shield of protection from accountability for one who makes false representations to another's damage." To be sure, the purchase of a home is not an everyday transaction for the average family. In many instances, it is the single most expensive and most important transaction of a lifetime. The seller and broker were experienced business people who, through the exercise of reasonable care, could have informed these relatively inexperienced buyers of the existence of the landfill. The Weintraub doctrine of justice and fair dealing and the Real Estate Commission required no less.
There is yet another reason why the brokers were under a duty to disclose the existence of the landfill. The New Jersey Real Estate Commission, which regulates the professional conduct of licensed brokers, required disclosure by them. The Real Estate Commission relied upon one of its regulations, N.J.A.C. 11:5-1.23(b), as authority for requiring disclosure by brokers. That regulation requires every licensee to "make reasonable effort to ascertain all pertinent information concerning every property for which he accepts an agency, and ... [t]he licensee shall reveal all information material to any transaction to his client or principal and when appropriate to any other party." The regulation requires every licensee to contact NJDEPE for information. N.J.A.C. 11:5-1.23(b), or its forerunner, became effective in 1975. Between February and April 1985, Gerald Furgione, marketing director for defendant Fox & Lazo, urged defendants Canuso, Sr., and Fox & Lazo to disclose the existence of the Buzby Landfill. Canuso, Sr., left the matter to Fox & Lazo.
This regulation represents a codification of public policy which affects both the brokers and the general public. Metromedia, Inc. v. Director of Div. of Taxation, 97 N.J. 313, 330, *107 478 A.2d 742 (1984). Clearly, a broker rendering a myriad of professional services to potential homebuyers "acts as the owner's agent in the sale of the home." Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 440, 625 A.2d 1110 (1993). The regulation has special importance to the public interest because it requires the broker to disclose facts which could affect health and quality of life. See Crema v. New Jersey Dept. of Envtl. Prot., 94 N.J. 286, 302, 463 A.2d 910 (1983). To be sure, the "health of the people is a primary concern of the social order, the first principle of all civil government. The safeguarding of the public health is thus an essential governmental function within the police power of the State." West Caldwell v. Caldwell, 26 N.J. 9, 30, 138 A.2d 402 (1958). In pursuit of that objective, it has become axiomatic that administrative agencies have wide latitude in selecting the appropriate procedures which enable them to implement legislative policy embodied in legislation the agencies are charged with enforcing. Texter v. Department of Human Services, 88 N.J. 376, 385, 443 A.2d 178 (1982). Consequently, nondisclosure by a broker after the duty was made known by the December 14, 1983 letter from the Real Estate Commission, exposes such a broker to a claim of fraudulent concealment.
Although we hold that under the circumstances, the seller and broker had a duty to disclose the existence of the landfill, the determination of whether that duty was breached and whether such a breach materially affected the desirability or value of the homes are issues which a jury must ultimately resolve. In an attempt to establish liability against the brokers, the Gaven plaintiffs must be permitted to present evidence that they specifically inquired of real estate agent Weakland about landfills in the area or the land surrounding the development, and they were not informed of the Buzby Landfill.

III
Plaintiffs further argue that the judge erred in granting summary judgment dismissing their claims based on the New *108 Jersey Consumer Fraud Act, N.J.S.A. 56:8-2 et seq. They claim that defendants' "concealment, suppression and omission of information about the Buzby Landfill" when dealing with prospective buyers violated the Act. The court apparently reasoned that because there was no duty to disclose the existence of the landfill, all omissions with respect thereto would not violate the Act.
The Act prohibits certain conduct in connection with the sale or advertisement of merchandise or real estate and provides that:
The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice; .... (Emphasis ours).
N.J.S.A. 56:8-2.
This statute creates two categories of prohibited acts. The first category (unconscionable commercial practices, deception, fraud, false pretense, false promise or misrepresentation) consists of affirmative acts, while the second category (concealment, suppression or omission of any material fact) consists of acts of omission. Affirmative acts require no showing of intent, while an essential element of a consumer fraud claim resting on an act of omission is that the defendants' act be "knowing." Chattin v. Cape May Greene, Inc., 243 N.J. Super. 590, 598, 581 A.2d 91 (App.Div. 1990), aff'd, 124 N.J. 520, 591 A.2d 943 (1991). The purpose of the Act is to protect the public from sharp practices and dealings in the marketing of merchandise and real estate which could victimize the consumer by luring the consumer into a purchase through fraudulent, deceptive or other similar kinds of selling or advertising practices. Daaleman v. Elizabethtown Gas Co., 77 N.J. 267, 271, 390 A.2d 566 (1978).
Under the plain language of the Act, a cause of action may be established for a "knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission in connection with the sale *109 ... of any ... real estate ... whether or not any person has in fact been misled, deceived or damaged thereby...." N.J.S.A. 56:8-2. We perceive no reason why the Act should not apply to sellers and brokers involved in the sale of hundreds of residential homes in a large development. We have already held that the Act applies to landlord tenant relationships in multiple dwelling units, 49 Prospect Street v. Sheva Gardens, 227 N.J. Super. 449, 461-69, 547 A.2d 1134 (App.Div. 1988), and the same rationale is applicable to this case. We conclude it was improper to dismiss the claims under the Act based on concealment, suppression and omission.
Plaintiffs also contend the judge improperly dismissed their claims under the Act based on affirmative misrepresentations contained in the brochures, newspaper advertisements and fact sheets. We fully agree with the judge that this contention, as far as the Act is concerned, lacks merit. Those statements were not proscribed by the Act. Rodio v. Smith, 123 N.J. 345, 352, 587 A.2d 621 (1991).

IV
Plaintiffs further contend the judge below erred in dismissing their claims against corporate officers Canuso, Sr. and Canuso, Jr. In order for personal liability to attach to a director or officer of a corporation for his or her tortious conduct, the evidence must demonstrate that he or she directed the tortious conduct to be done, or participated or cooperated therein. Trustees of Structural Steel, et. al. v. Huber, 136 N.J. Super. 501, 505, 347 A.2d 10 (App.Div. 1975), certif. denied, 70 N.J. 143, 358 A.2d 190 (1976). Despite plaintiffs' assertions to the contrary, our review of the appellate record fails to disclose any evidence that those officers could be held personally responsible. Based upon the lack of evidence, the judge properly concluded there was no legal basis for personal liability by the Canusos. We affirm that conclusion.
Summary judgment dismissing the complaint of Helbling was proper based on language in a release which he signed. His *110 separate law suit alleged, among other things, common law fraud and consumer fraud with reference to nondisclosure of the Buzby Landfill which were covered by the release. Thus, the trial judge had a proper basis to conclude that his complaint should be dismissed.
We are also persuaded that the dismissal of the count alleging a violation of the Uniform Fraudulent Conveyance Law, N.J.S.A. 25:2-7 et seq., replaced by the Uniform Fraudulent Transfer Act, N.J.S.A. 25:2-20 et seq., was proper since that law has no application to this case. Plaintiffs presented nothing to indicate there was a fraudulent conveyance.

V Class Action Certification

Plaintiffs also argue the trial judge erred in denying a certification of this litigation as a class action. They accurately state that the judge found that the requirements of R. 4:32-1(a) were satisfied: (1) numerosity; (2) commonality; (3) typicality, and (4) adequacy of representation. The record supports that finding and no appeal has been taken therefrom.
The judge found, however, that one of the alternative requirements of R. 4:32-1(b) was not met. The court stated that "Although plaintiffs' causes of action embrace common legal and factual elements, the critical question remains whether the benefit from the determination in a class action of the existence of a ... common pattern of fraud outweighs the problem of individual actions involving such other issues as causation, reliance, and damages."
We are unable to discern precisely why the judge felt that R. 4:32-1(b) had not been satisfied. The record does not contain a promised explanation. However, the judge apparently felt the issues were too multiple and complex for a jury that must delve into how each plaintiff understood and relied on the concealments and the fact that each house is located a different distance from the landfill. This suggests to us that the judge relied on R. 4:32-1(b)(3), *111 namely, that common questions of law or fact do not predominate over questions affecting only individual members.
While there is the common question of fact and law, the real issue is whether they "predominate over any questions affecting only individual members." R. 4:32-1(b)(3) (emphasis added). It has been said that the "commonality becomes obscured when the probable unique issues of liability, causation and damages in each case are considered, requiring individualized treatment at trial." Saldana v. City of Camden, 252 N.J. Super. 188, 197, 599 A.2d 582 (App.Div. 1991).
But under In re Cadillac V8-6-4 Class Action, 93 N.J. 412, 431, 461 A.2d 736 (1983), if a "common nucleus of operative facts" exists, predominance may be found. In re Cadillac found common issues of law or fact on many issues as well as four substantial individual issues: proof of design defect caused by the claimed damage, failure by GM to cure the defect, actual negligence by class members or GM's misrepresentation and damages of each class member. Id. at 431-32, 461 A.2d 736. Yet the Court granted certification notwithstanding the presence of individualized issues apart from damages. Here, as in In re Cadillac, plaintiffs seek to redress a common legal grievance. Id. at 435, 461 A.2d 736.
The trial judge found that the class action is "superior to other available methods for a fair and efficient adjudication of the controversy." R. 4:32-1(b)(3). This rule should be liberally construed in a consumer fraud case. In re Cadillac, supra, 93 N.J. at 435, 461 A.2d 736. To the same effect is Delgozzo v. Kenny, 266 N.J. Super. 169, 178-81, 628 A.2d 1080 (App.Div. 1993). Hence, we read In re Cadillac and Delgozzo to require class action certification under R. 4:32-1(b)(3).
It follows therefore that because class action certification is required, it was improper to grant a severance.
All of the remaining issues raised by the plaintiffs we find to be without merit. R. 2:11-3(e)(1)(E). To summarize, we reverse the *112 finding of no duty to disclose the existence of the landfill, the denial of class action certification and the severance of all claims We affirm on all other issues raised by plaintiffs.

VI
Finally, we consider the cross-appeal which urges a reversal of the order requiring a jury trial on the Consumer Fraud Act claims. Based on concessions made during oral argument, the trial judge is directed to use the trial jury as an advisory jury on the Consumer Fraud Act claims. Special interrogatories should be employed so that a proper verdict can be molded.
The summary judgments are reversed in part and affirmed in part. The matter is remanded to the Law Division for further proceedings.