288 N.J. Super. 504 (1996)
672 A.2d 1190
ROXANNE GENNARI, PLAINTIFF-RESPONDENT-CROSS APPELLANT,
v.
WEICHERT CO. REALTORS, INDIVIDUALLY AND AS AGENT OF TIMBERLINE PROPERTY DEVELOPMENT, INC., DEFENDANT-APPELLANT-CROSS RESPONDENT, AND TIMBERLINE PROPERTY DEVELOPMENT, INC., A CORPORATION OF THE STATE OF NEW JERSEY AND ALLEN RUMBERG AND ELLEN RUMBERG, INDIVIDUALLY AND AS PRINCIPALS, AGENTS OR EMPLOYEES OF TIMBERLINE PROPERTY DEVELOPMENT, INC., AND WEICHERT REALTORS, AND VAN NOTE-HARVEY ASSOCIATES AND J.E.M. HEATING AND COOLING, DEFENDANTS, AND WEICHERT CO. REALTORS, DEFENDANT-THIRD PARTY-PLAINTIFF,
v.
J.E.M. HEATING AND COOLING, INC. AND RICK INGS, THIRD PARTY-DEFENDANTS. JAMES NESTOR AND JOAN NESTOR, PLAINTIFFS-RESPONDENTS-CROSS APPELLANTS,
v.
WEICHERT CO. REALTORS, INDIVIDUALLY AND AS AGENT OF TIMBERLINE PROPERTY DEVELOPMENT, INC., DEFENDANT-APPELLANT-CROSS RESPONDENT, AND TIMBERLINE PROPERTY DEVELOPMENT, INC., A CORPORATION OF THE STATE OF NEW JERSEY AND ALLEN RUMBERG AND ELLEN RUMBERG, INDIVIDUALLY AND AS PRINCIPALS, AGENTS OR EMPLOYEES OF TIMBERLINE PROPERTY DEVELOPMENT, INC., AND WEICHERT REALTORS, AND VAN NOTE-HARVEY ASSOCIATES AND J.E.M. HEATING AND COOLING, DEFENDANTS, AND WEICHERT CO. REALTORS, DEFENDANT-THIRD PARTY-PLAINTIFF,
v.
J.E.M. HEATING AND COOLING, INC., AND RICK INGS, THIRD PARTY-DEFENDANTS. RAJAN S. MATHEWS AND GRACE MATHEWS, PLAINTIFFS-RESPONDENTS-CROSS APPELLANTS,
v.
WEICHERT CO. REALTORS, INDIVIDUALLY AND AS AGENT OF TIMBERLINE PROPERTY DEVELOPMENT, INC., DEFENDANT-APPELLANT-CROSS RESPONDENT, AND TIMBERLINE PROPERTY DEVELOPMENT, INC., A CORPORATION OF THE STATE OF NEW JERSEY AND ALLEN RUMBERG AND ELLEN RUMBERG, INDIVIDUALLY AND AS PRINCIPALS, AGENTS OR EMPLOYEES OF TIMBERLINE PROPERTY DEVELOPMENT, INC., AND WEICHERT REALTORS, AND VAN NOTE-HARVEY ASSOCIATES AND J.E.M. HEATING AND COOLING, DEFENDANTS, AND WEICHERT CO. REALTORS, DEFENDANT-THIRD PARTY-PLAINTIFF,
v.
J.E.M. HEATING AND COOLING, INC., AND RICK INGS, THIRD PARTY-DEFENDANTS. RAYMOND LACHAPELLE AND JANET LACHAPELLE, PLAINTIFFS-RESPONDENTS-CROSS APPELLANTS,
v.
WEICHERT CO. REALTORS, INDIVIDUALLY AND AS AGENT OF TIMBERLINE PROPERTY DEVELOPMENT, INC., DEFENDANT-APPELLANT-CROSS RESPONDENT, AND TIMBERLINE PROPERTY DEVELOPMENT, INC., A CORPORATION OF THE STATE OF NEW JERSEY AND ALLEN RUMBERG AND ELLEN RUMBERG, INDIVIDUALLY AND AS PRINCIPALS, AGENTS OR EMPLOYEES OF TIMBERLINE PROPERTY DEVELOPMENT, INC., AND WEICHERT REALTORS, DEFENDANTS, AND WEICHERT CO. REALTORS, DEFENDANT-THIRD PARTY-PLAINTIFF,
v.
J.E.M. HEATING AND COOLING, INC., AND RICK INGS, THIRD PARTY-DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued January 10, 1996.
Decided March 15, 1996.
*512 Before Judges SHEBELL, STERN and NEWMAN.
Martin Newmark argued the cause for appellant (Broderick, Newmark & Grather, attorneys; Alan J. Baldwin and Mr. Newmark, on the brief).
George T. Dougherty argued the cause for respondents (Katz & Dougherty, attorneys; Mr. Dougherty, on the brief).
Leon B. Piechta argued the cause for defendant, Ellen Rumberg (O'Donnell, Kennedy, Vespole, Piechta & Trifiolis, attorneys; (Mr. Piechta, of counsel; Francis J. Panzini-Tomeo, on the brief).
Greenbaum, Rowe, Smith, Raven & Davis, attorneys for amicus curiae, New Jersey Association of Realtors (Arthur M. Greenbaum, of counsel; Bruce Greenberg on the brief).
The opinion of the court was delivered by SHEBELL, P.J.A.D.
Defendant, Weichert Company Realtors (Weichert), appeals, on leave granted by this court, from an interlocutory order, entered after a bench trial on liability only, finding Weichert liable under the Consumer Fraud Act, N.J.S.A. 56:8-2, as the sole proximate cause of plaintiffs' damages resulting from defective construction of homes purchased by the plaintiffs at a development in Lawrence Township, Mercer County, called Squire's Runne. The plaintiffs in these four consolidated actions were all purchasers in a development marketed by Weichert and built by defendant Allen Rumberg and defendant, Timberline Property Development (Timberline), a corporation owned by the builder and his wife, defendant, Ellen Rumberg. Ellen Rumberg was also employed by Weichert as its sales representative on the site.
Plaintiffs cross-appeal from the dismissal of their common law fraud and the Consumer Fraud Act claims against Allen Rumberg and Ellen Rumberg, and common law fraud claims against Weichert. *513 They also appeal the dismissal of their consequential damages claims based on emotional distress.
Plaintiffs, Roxanne Gennari, James and Joan Nestor, Rajan and Grace Mathews, and Raymond and Janet LaChapelle, filed separate verified complaints against Timberline and the Rumbergs. The complaints alleged common law fraud and consumer fraud and sought compensatory and punitive damages. Thereafter, plaintiffs filed amended complaints naming Weichert as an additional defendant. Weichert filed its answers, generally denying the allegations, and asserting by way of defenses, no breach of duty owed to plaintiffs, estoppel by deed, waiver, and the statute of frauds. Weichert also crossclaimed for contribution and indemnification and filed a third-party complaint against J.E.M. Heating and Cooling, Inc. (J.E.M.), and Rick Ings for indemnification and contribution. Plaintiffs Gennari, Nestor and Mathews subsequently filed second amended complaints naming Ings and J.E.M. as direct defendants.
The cases were consolidated, and commencing June 1, 1993, a bifurcated trial as to liability covered 34 days, over a period of 8 months. An oral decision was rendered on May 13, 1994, finding defendant, Weichert Realty, liable under the Consumer Fraud Act, N.J.S.A. 56:8-2, as the sole proximate cause of defective conditions relating to the structural, functional, and appearance aspects of the plaintiffs' homes. An order embodying the judge's decision was entered on May 26, 1994.
Squire's Runne is a thirty-five house development. Allen Rumberg began his experience in the construction of wood frame housing with his employment in 1979, by his brother-in-law, Philip Kayne, a developer and builder of commercial and residential property since 1963. Kayne is the brother of Ellen Rumberg. Ten years earlier Rumberg had graduated from Indiana Technical Institute with a degree in mechanical engineering. During the years after he graduated, Rumberg worked in engineering, and around 1976 he started working part-time with Kayne. In 1979, he started working full-time with Kayne's construction company.
*514 Rumberg's first building project while working full-time with Kayne was a twenty-six house development in Parsippany. He was a supervisor. After Parsippany, Rumberg worked with Kayne in Florham Park, a project of ten to thirteen lots, again in a supervisory capacity. Rumberg, however, maintained that he was a "co-builder" with Kayne in that development.
In 1981, Kayne and Rumberg came to a "verbal" understanding that Rumberg would share in the profits in some of the developments. About that time, Kayne purchased sixteen to eighteen lots in Livingston. Although Rumberg characterized himself, again, as "co-builder," Kayne described Rumberg's duties as supervisory, but said Rumberg was allowed to take on responsibility in dealing with people and in answering questions.
Before the Livingston project was completed, Kayne entered into a joint venture, consisting of thirty-five homes in Mendham, with a law firm and bank. Rumberg was promised 10% of the profits as an overseer of the construction. However, Rumberg and Kayne had a falling out before the development in Mendham was completed and they parted ways. At the point that Rumberg left that project, ten to thirteen homes had proceeded to closing.
Nevertheless, Kayne agreed to form the Habonim Corporation with Rumberg. Rumberg was president and owned 40% of the company. In late 1984 or early 1985, Rumberg and Kayne found four lots in an existing subdivision in Holmdel. The company purchased the lots and called it Hidden Manor. Rumberg selected Weichert to market the homes because Weichert was willing to pay for all of the project's advertising, preparation of brochures, inserts into newspapers, and communication with other realtors. Ellen Rumberg, who had worked for Weichert as a salesperson for about a year, helped in the negotiations between Thomas Glick, manager of Weichert's East Brunswick office, and her husband. She became the listing agent for that development. Rumberg maintained that he performed the building services on the Holmdel development and that no one supervised his work at that site. Kayne, however, asserted that nothing Rumberg did at Mendham, *515 Livingston, Florham Park or Holmdel was ever accomplished without Kayne's supervision.
Three of the four purchasers at the Hidden Manor development at Holmdel were not satisfied with Rumberg's work. According to one, he contracted with Rumberg on July 6, 1985. The closing was scheduled for December 15, 1985, the date Rumberg chose. However, the foundation was not even started until late October or early November. By mid-December, the house was 80% framed but had no roof. Construction progressed very slowly after that with a variety of problems. The absence of a roof and windows allowed rain and snow to permeate the subflooring in the house making it soft and weak. Nevertheless, oak hardwood flooring was put on top, again before windows and a roof were installed, allowing it to get wet, shrink, discolor and stain. The closing on the property eventually occurred in July, 1986. At that time there were many items unresolved and the purchaser's attorney insisted that $27,500 be put in escrow in order to assure that the problems were resolved. It took two years to do so.
A second Holmdel house went to contract on October 9, 1985, with closing scheduled for March 15, 1986. It did not close until September 1986 and the purchaser experienced problems. The oak hardwood flooring was installed before the roof was in place and it, too, buckled and warped. Doors were cracked but were hung nevertheless. Cabinets were not finished properly; the heating system had improper sized motors which had to be replaced; the ductwork in the basement had sections which broke off; the roof in the family room leaked and pipes for an upstairs bathroom were run through the garage but not insulated so they froze in the winter.
The purchasers of the third house did not testify about its condition. Instead, Lawrence Swirsky, an expert in home inspection and construction, who examined plaintiffs' houses, inspected this home. He found holes in the cinder block foundation caused by improper waterproofing on the outside of the foundation. The girders and floor joists were not properly supported and secured. *516 The floors were uneven because the framers did not properly lay the floor joists. The air conditioning system's supply and return ducts were inadequately sized. The framing materials were of poor quality and in his opinion, this home did not represent quality construction.
In late 1985 or early 1986, Rumberg was shown the property which was to become the Squire's Runne development by his wife with an agent who listed the property. The Rumbergs used an existing corporation, R & R Property Development, Inc., to buy what was a sod farm. Rumberg sought a subdivision and received final approval on October 22, 1986. He engaged Weichert to begin marketing the property as Squire's Runne. Weichert's listing agreement took effect on March 1, 1986, and its responsibilities included paying for the total cost of the sales trailer at the site and advertising which totaled $70,000. Weichert expected to realize a profit of over $200,000.
Roxanne Gennari was the first of the four plaintiffs to contract for a new home in Squire's Runne. Gennari, a full-time real estate agent, was active in Mercer County since 1980. In April 1986, Nancy Healey, Gennari's neighbor and a Weichert agent, told her about a new development Weichert was marketing. Although Gennari was not looking for a new home, she was impressed with Healey's description of both the builder and the development because Healey was someone whose opinion Gennari respected. She and Healey were business partners, and had purchased a lot in a Windsor Township development on which they intended to have a house built and then to sell it.
Healey told Gennari that Squire's Runne was to be constructed by a North Jersey builder who had built hundreds of homes and was a person of detail and craftsmanship. If they acted quickly, they could get in at pre-construction prices. In Healey's opinion, this represented a wonderful investment. Gennari was interested and excited not only because of her friend's opinion but because she knew Weichert was a large and reputable firm and was behind the development. At the site, Gennari first met Ellen Rumberg. *517 She confirmed that her husband had built hundreds of homes, demanded excellent quality, and that he built homes in Mendham. She said he has five engineering degrees and that he was "timely."
Prior to Gennari's May 14, 1986 contract signing, Healey invited her to attend a meeting at Weichert's Princeton office with the builder. At that meeting, Rumberg claimed he had a father and son team who would be working on this project and who had been working with him for years, and that he was so particular only one man in the whole State could do Rumberg's stucco work. He produced a portfolio with a number of photos of homes. Healey told Gennari that Rumberg built the homes. She reiterated that Rumberg had built hundreds of homes and had recently finished a development in Mendham.
After the meeting, Gennari asked Healey to go to look at the homes that Rumberg had built in Mendham. Healey did, and reported back that the homes were more beautiful than the photographs; the development was gorgeous, the detail exquisite, and the craftsmanship excellent. Gennari expressed concern about the closing date to Healey and the Rumbergs. She asked to close in January, 1987. Ellen Rumberg asserted that her husband always closed on time. Gennari, therefore, signed her contract on May 14, 1986.
Healey testified that the only things she told Gennari about the development were that they could purchase early at a reduced price and that it was going to be located on a beautiful piece of property. She denied ever describing Rumberg as the best builder from North Jersey and denied that she ever told Gennari that Rumberg had built hundreds of homes. She also denied going to Mendham after the meeting with Gennari and Rumberg and reporting back to Gennari as to what she had seen. Healey and her husband, though, had driven to Mendham before Gennari's meeting with Rumberg. They spoke to a resident in the development who was happy with the builder and his home.
Gennari made color and option selections with Ellen Rumberg. The process was finished by early fall, but nothing was happening *518 on the site despite the January 2, 1987 closing date. Ellen Rumberg told her not to worry, and blamed the delay on the township which did not give final subdivision approval until the end of October. Rumberg received the building permit for the Gennari lot on November 17, 1986.
Gennari was not able to inspect her home while it was being constructed. There was no road to the homesite and no easy way for her to get there. Rumberg told her that one of his rules was that purchasers were not welcome to go to the homes. She would have to have his specific permission to visit the property during construction. Rumberg posted a security guard to prevent access to the homes. On one occasion, Gennari slipped by the guard, got into the house, and complained about some deficiencies. Rumberg became angry, ordered her to stay away from the home and indicated he would fire the guard. Gennari noticed two obvious problems with the house. The back stairs were constructed so that they jutted into one of the bays of the two-car garage, effectively rendering it a one-car garage and the brick being put on the front of her home was the wrong color. The staircase was removed when Rumberg maintained that there was no other way to construct it. Rumberg also corrected the mistake with the brick.
The Gennari closing was delayed until January, 1988. The only walk-through of the house permitted occurred on the day of the closing. Gennari noticed many problems. She observed drainage problems and a large hump on the front lawn. She had seen these months earlier and was assured by Ellen Rumberg, that they were just grading problems. There were gaps and buckling in the siding; bent wood in the trim; the roofing was discolored and not what she had chosen; and there were cracks in the foundation. The garage and basement floors were badly cracked, the basement walls had several large cracks, a kitchen wall was bowed, and the hardwood floors had gaps throughout. The most serious problem was with the heating system. Upstairs was extremely hot, while downstairs the heat was inadequate. She was told that *519 the heat problem was simply a matter of adjustment. Someone allegedly had brushed up against the thermostat which caused the excessive heat upstairs. She was told that the mound on the front yard was there because the township ordered that type of grading and there was nothing they could do about it. She later found out that the mound was associated with the aerobic wastewater disposal system that was required in place of a normal septic system.
Despite the problems, Gennari went to closing because the people who bought her old home wanted her to leave, and Rumberg threatened to sue her if she did not close on time. Furthermore, she feared loss of the nearly $100,000 she had already deposited. She was assured by the Weichert representatives at the sales trailer that everything would be taken care of.
Once she moved in, however, the heating system was not working properly and the septic system overflowed onto the front lawn, backed up into the basement, and caused a terrible smell in the bathrooms. Twice she had ankle deep water in the basement from septic system overflow. The installer of the system explained that normally there is an overflow alarm on the system, but it had not been hooked up. Further, although she was told the system would have a 1500-gallon capacity, it was downsized to hold only 500 gallons. This was inadequate as six people were living in the house, using about eight hundred gallons of water a day. The system repeatedly overflowed even to the time of trial. As to the heating system, the ductwork had fallen into the basement several times because it was not secured properly. Although it was a two-zone system, the system was not constructed so that the zones were entirely separate and both systems were feeding off only one return.
Gennari also complained that the windows were inferior and leaked air and water. She had chosen Andersen Windows, but had been given the Ideal brand instead. Her hardwood floors were still a problem at the time of trial. Each time Rumberg sent people over to fix them, they made the situation worse. They were still buckling and not level, had large gaps and were poorly *520 finished. The exterior of the property was never properly graded causing pooling of water which flooded her basement and her front walkway.
Grace and Rajan Mathews, other disgruntled buyers, found Squire's Runne through a builder-friend who suggested that they get in touch with Ruth Skonieczny, a Weichert agent. Grace was familiar with Weichert as one of the biggest real estate companies in New Jersey. She associated the Weichert name with very good quality homes. She met with Skonieczny, who gave her a brochure and promotional material. Grace was impressed with the fact that these were going to be custom built homes with flexibility in design, that nationally known brand name materials were being offered in the houses and that such a large realtor with name recognition was making the offering.
Within the first two weeks of May 1986, the Mathews met with Skonieczny at the site and first asked who the builder was. They were told that Rumberg had built hundreds of homes, and that she herself had worked with him very closely at a development in Holmdel, along with Rumberg's wife, Ellen. She claimed Rumberg was an excellent builder with great credentials and was known for quality workmanship, performed by crews who had worked with, and for him, in the past. She asserted that Rumberg was devoted to detail and actively supervised the building of the homes. The Mathews were presented with a portfolio of impressive homes which Rumberg had built.
They discussed the completion of the home, as the Mathews were expecting their first child in the early part of September. They specifically asked Skonieczny what her experience had been with Rumberg as to timely closings. She represented that Rumberg needed three to four months to complete a home and was very good about meeting deadlines and was always within two weeks of the scheduled closing date.
The Mathews met with Rumberg himself before signing the contract. He said he had built hundreds of homes and had qualifications, experience and expertise necessary and he took *521 care in building homes, using quality craftsmen and crews brought with him from other developments. He maintained that he spent much time supervising his projects and introduced them to his supervisor. When the Mathews raised the timing issue, Rumberg confirmed that closing would be three to four months from the time they signed the contract.
They signed the contract on June 17, 1986, with a closing date of December 30, 1986, or four months from the issuance of a mortgage commitment, for the base price of $360,000. The Mathews did no checking on their own to verify the representations made about Rumberg's experience or qualifications. Skonieczny showed them newspaper articles about the development to support her claims. The articles also referred to the builder's commitment to quality, use of top-grade construction materials and quality workmen, and his framing of homes in Douglas fir.
In August, though, when they had noticed nothing had been done on their lot, they checked with Skonieczny who said Rumberg had run into problems with the township and that the building process would take an additional month and a half. They listed their home for sale with Weichert through Skonieczny. She sold their house with a closing date in February, 1987. She assured the Mathews, however, that they would be in the Squire's Runne home in early February. That date came and went as did several others in early 1987. As with Gennari, Rumberg promised month by month a closing date, and each month the date got pushed back. The buyers of their home were cooperative, however, and agreed to the extension until April, when they gave the Mathews a deadline to the end of May. At the end of May, the Squire's Runne home was still not ready. The Mathews first moved in with friends and rented a townhouse in Princeton Junction on a monthly basis. They finally closed on September 26, 1987.
Up to the date of closing, the Mathews were not allowed to visit their homesite, as Rumberg said they could not go in without his permission. Rumberg posted a guard and the Mathews never *522 tried to get by him to see their home. Their first inspection was on the date of the closing and resulted in a four-page list of items which the Mathews found incomplete or not done properly. Rumberg, though, said the repairs could all be completed within thirty days and the Mathews went through with the closing.
After living in the house for four or five days, upon finishing a load of wash, they saw foam all over the front yard. Rumberg responded they were using the wrong detergent. Over the next several days, the windows started collapsing. Fog was appearing between the panes and the windows began leaking air as the weather got colder. They thought these were Hurd windows, which had a high quality reputation, but Rumberg told them that they got Ideal windows instead. At first, the leakage was only from air, but after a very heavy rain, three of the windows were also leaking water under the sills.
As time went on, the Mathews noticed other serious problems. Their bathroom pipes went through the garage area. They froze because there was no insulation even though they had paid for an upgraded insulation package. There was a severe water problem in the basement. The basement walls were wet and water came in from beneath a concrete slab which was part of the entry way into the house. The walls in the entry way and around the stairway were bowed and misaligned, and there was a slope in the entry foyer floor. Doors were misaligned and could not be secured because the bolt did not meet the hole on the doorframe. The hardwood floors also had defects. The septic system continued to overflow even though they changed detergents and it made a gurgling noise that could be heard throughout the front of the house, as a silencer had not been installed. There was also a problem with the timing of the pumps. Four pumps failed within a year and a half, some of which occurred when the system's one year warranty expired and for which the Mathews had to pay.
Furthermore, the heat distribution was uneven and the bedroom over the garage was extremely cold, as was the adjoining bathroom. Only once, after the Mathews repeatedly complained to *523 Rumberg, did Rumberg send someone over to look at the heating system. That person looked at the ductwork and never came back. A portion of their roof bowed, but Rumberg claimed it was a result of normal settling.
In June 1986, Joan and James Nestor saw an advertisement for Squire's Runne. Because of its location and because it was offered by Weichert Realtors, it immediately interested them. Joan went to the site alone, meeting first with Ellen Rumberg who introduced herself as a sales representative of Weichert. She informed Joan that she was the builder's wife and would be involved in the building process. She stated that her husband had an engineering degree, had over ten years of building experience, had built over a hundred homes and had used a crew that had been with him for years. He was a man who paid extreme attention to detail. Ellen stated that Weichert supported her husband one hundred percent.
On June 10, 1986, the Nestors and the Rumbergs met at the site. Nestor noticed a large sign advertising Squire's Runne with a logo and only Weichert's name on it. The brochure Mrs. Nestor was given had only Weichert's name on it. Rumberg talked about the wonderful Hurd windows he used in the development and Ellen brought out other samples of materials Rumberg used in these homes, including Revere siding. Rumberg told them that he was a quality builder, had built over one hundred homes, had more than ten years of experience as a builder, used an experienced crew of workmen who had been with him for years, and that he hired the finest workers. He told them he had four degrees, but was most proud of his engineering degree. Ellen added that her husband's customers loved him and some of them still called the office about him. Ellen said Weichert was supporting her husband one hundred percent. The Nestors recalled how the Rumbergs kept repeating that Allen used experienced workers and good quality materials.
On June 14, 1986, the Nestors went to an address in Mendham given to them by Ellen Rumberg, as a home her husband had *524 built. The homeowner told them that she had been in the house only two weeks and was its second owner, so she did not know the builder. She gave them a tour of the house which the Nestors found to be absolutely beautiful. They were convinced that a top builder built that home. The only problem they saw were some gaps in the hardwood flooring.
They immediately scheduled another appointment with the Rumbergs to talk about building their home and on June 19, 1986, they chose a lot. They were initially interested in lot number three but Rumberg persuaded them to choose lot twenty-four instead because it had "perked" beautifully. Rumberg asserted that he had never built a home that had a water problem, but he had some concerns in that regard with lot three. They took lot twenty-four because Rumberg claimed they would never have a water problem there. Ellen said the closing would be January 15, 1987, as her husband built homes in four months. She also stated that the January date was firm. At that meeting, Joan Nestor mentioned the unsightly gaps in the hardwood floor that she had seen in the Mendham house. Allen Rumberg told her that it occurred because those people had chosen a lower grade of wood and he would not allow that to happen at Squire's Runne.
They signed the contract of sale on July 15, 1986, with a closing date of January 15, 1987. The Nestors were given a choice between Andersen and Hurd windows and initially indicated a preference for Andersen. However, Allen Rumberg gave a lengthy presentation using a Hurd window sample. The Nestors then chose Hurd windows, and Ellen Rumberg checked the space next to Hurd windows on the selection sheet. Rumberg asserted that Douglas fir was the premier lumber in construction and that it would be used in their house.
By October 1986 nothing was happening at the site and so the Nestors stopped at the trailer and met Ruth Skonieczny. She introduced herself as a Weichert sales agent. They asked what was going on. She told them that they had to trust the builder, and that Lawrence Township was delaying Rumberg. The January *525 closing date, however, passed without explanation. Rumberg assured them in late January that they would be in their house by March. In March, the framing on the house was only half done, but in May, the Nestors received a notice that another installment payment was due because the roof and windows were in place. They attempted to visit the site on several occasions but a guard was posted who said no one was allowed on the site. They were able to view the home only from a distance, and nothing appeared unsatisfactory from their distant vantage point.
In July 1987, Joan Nestor went to the site to meet with the mason about a fireplace. She found the siding color was yellow. They had, however, chosen a tan which they had coordinated with the roof and shutters. At that point though, at least seventy-five percent of the siding was on. The Nestors themselves were in a time bind because there was a contract of sale on their own home, and, therefore, they decided to keep the wrong color siding.
The Nestors needed to close in September because they had a mid-October closing date on their old house. Their written request to Rumberg received no response. In early October, James Nestor met with Rumberg and told him that they had to close by October 19, or he would be forced to rent with a minimum three-month lease which would postpone the closing for three months. On October 7, the Nestors were allowed a walk through of the home, accompanied by their privately retained home inspector, in preparation for an October 10, 1987 closing. There were dozens of workers in the house.
The inspector pointed out there was no heat flowing in the rooms over the garage and water was pooling on the western side of the house. Other less serious problems involved fixtures which had not yet been installed and items which were not completely assembled. There was so much disorder in the house that they could not make a thorough inspection. Rumberg told the Nestors that the heating difficulty was a balancing problem and nothing to worry about. Similarly, he stated the water pooling on the *526 western side of the house was a simple regrading problem. Nestor accepted those explanations.
The Nestors went back to the site and walked through the house by themselves on October 9. Several problems had been corrected but, for the first time, they were able to see the floors and were shocked because they were discolored and stained. They told Rumberg that they were not going to close with the floors in that condition. Rumberg assured them that he would take care of the floors and agreed to house the Nestor family in the Hyatt Hotel while the floors were redone after closing. Under those conditions the Nestors closed on October 10.
The Nestors moved into the house on October 21, 1987. The basement on the west side of the house was wet. There was a long list of other problems which required workmen to come to the house, but repairs progressed at a slow pace. The Nestors felt cold winds from gaps in the drywall, the heating was uneven and, like the rooms over the garage, the main bath and the master bath were particularly cold. The family room, which had a cathedral ceiling, was also much cooler than the kitchen which was next to it, causing drafts. Workmen spent two hours on one occasion working on the system, but after they left, the Nestors noticed no improvement. Further, there was no insulation in the rooms abutting the garage. Rumberg sent workers to install insulation, but they installed it backwards. The second-floor bedroom was heated only when the first floor heater was on in the two-zone system, and only the rooms at the very center of the house got reasonable heat.
In January 1988, James Nestor again saw a pool of water sitting against the western side of his house. He went into the basement and saw water pouring through the basement windows onto the floor. He called and Rumberg and his superintendent came to the house within minutes. The two of them ran back and forth from basement window to basement window with Rumberg shouting: "[W]hat are we going to do, what are we going to do." Nestor also showed them cracks in some of the basement girders, but *527 both told him it was nothing to worry about. Nestor also showed them several lolly columns that were not supporting girders, but was told they would just put shims there. However, no one ever came to do the work. Nestor took the men upstairs and showed them the windows. The corners did not meet the frame and air was leaking in. Rumberg told him that the windows were Ideal windows. Nestor protested, saying that they had selected Hurd windows but Rumberg maintained that they had not. A representative from the window distributor came to look at the windows. He maintained that the gaps were normal. To correct the problem, the representative stuck black weather stripping into the gaps claiming that was all that could be done.
The Nestors were told they were going to have a standard septic system. Instead an aerobic wastewater treatment system was installed which subsequently overflowed onto their front lawn. The Nestors had to be careful about the volume of water that passed through the system, as well as the soaps and paper they used.
The LaChapelles were attracted to Squire's Runne by Weichert's ads. Janet LaChapelle had worked full time as a real estate agent in Princeton Junction between 1974 and 1975, but was inactive in the real estate business at the time she saw the development. She had known of the Weichert name, though, for many years. It was an established company and she knew if Weichert had a listing, you could rely on the information on the listing sheet. On July 13, 1987, she and her husband went to the site and spoke to Ellen Rumberg who said her husband was the builder, and that he had built homes in Mendham, Holmdel and Livingston. In response to Janet's question, Ellen said that her husband had been in business over ten years and had built hundreds of homes. He had a crew and a "super" who had been with him for years. He paid more than the normal rate to his super, as well as a $1000-$1500 per home bonus to get construction done on time.
*528 Before the LaChapelles signed a contract, Janet took a ride to Holmdel to see the homes that Rumberg built there. She went to the same model home that she was interested in, but no one was home. She spoke with a landscaper who indicated that he had heard the homeowners were unhappy about a banister, but he really did not know what the situation was. The LaChapelles then went to Mendham and talked to a homeowner who was outside of the house. He was the second owner of the home and had no idea who the builder was. They went to another house and found a homeowner who showed them around the house. She loved the house but did not recognize the name Rumberg. She said the name of the person she had worked with was Phil. The next day, the LaChapelles told Ellen about the conversation and asked who Phil was. Ellen said that Phil was the superintendent on that job and was Allen's brother-in-law.
The LaChapelles signed their contract on July 19, 1986, and had a closing date of March 1, 1987. Although the Rumbergs attempted to persuade Janet that Hurd windows were better than Andersen, she chose Andersen. The LaChapelles also could only watch their home being built from a distance. They were told they could not go near the home. In the spring, Allen Rumberg told the LaChapelles that their home would be ready "soon." In response, they put their house on the market in May and sold it within four to six weeks. Janet then told the Rumbergs she had a buyer and needed a closing date. Allen said their new home would be ready in August. She then agreed to a closing date of October 14, 1987 for her house. In October, the Squire's Runne home looked as if it was ready, but the LaChapelles could not get in. They and their three children were forced to move into a two-bedroom, one-bath condo. Rumberg promised them that they would be in by Thanksgiving and then promised closing by Christmas. Because they would have lost their mortgage if they did not close by December 30, 1987, they closed that day.
On the day of closing, the house was littered and a man was sweeping things up. He kept telling them to get out of the house. *529 They were disgusted and talked about whether they would go through with the closing. However, if they did not, they would have lost their mortgage commitment as well as the $100,000 in deposit money they had already given Rumberg.
They moved in the following day. When they walked into the house after the closing, it was cold. They found this odd since the day before they noticed how hot it was. They called the superintendent to take care of it. Someone had turned the emergency switches off because there was a short in the thermostat and the heat would not turn off by itself. During the night they heard a loud bang from the basement. They went downstairs and saw that a heating system duct had fallen to the floor. After the ductwork was repaired, they found they had very little heat on the second floor and that there were "dummy" registers.
Almost immediately, there were also problems with the windows. They were drafty and permanently fogged between the double panes. They discovered that they did not have the insulation they paid for. The LaChapelles had a problem with their siding as well. There were no window and edge finishing pieces, and consequently, hornets, bees and other insects built nests between the siding and the wood frame. The hardwood floors also had defects requiring that, in February 1988, they move out of the house while the floors were redone.
The plaintiffs hired a number of experts to inspect their homes. Mark MaGrann, president of an energy and building consulting firm, did a thermographic survey of the Nestor, Gennari and Mathews residences to determine the energy efficiency and insulation quality of their homes. In all three homes he found that the insulation was poorly done; on a scale of one to ten, he rated the insulation work as, at most, a two or three. There was so much outside air infiltration that the interior walls and ceilings were cold in the winter. He stated some infiltration is normal and will show up in some spots on exterior walls, but flaws in these homes were so extensive that cold air was penetrating between the gaps in the *530 floors and cooling ceilings as well as interior partitions and soffits. There were places along the walls where there was no insulation.
An expert was also hired by plaintiffs, Nestor, Gennari and Mathews, to inspect their HVAC systems. The two-zone systems in these homes were designed so that both furnaces were connected to a common return, seriously diminishing their efficiency. Their expert had never seen a two-zone system intentionally designed so that the cold air returns were combined. The duct work was undersized, so that some rooms had no air flow at all and other rooms receiving only minimal airflow. The ductwork was not properly supported. The standards require that the lateral ductwork be supported every five to seven feet, depending upon the size of the ductwork, whereas in these homes the ducts would go fifteen to twenty feet without any supports. This caused them to droop, and over time, to fall apart. In some areas, ducts were not even connected to the trunk lines. Two bathrooms had no warm air because the ductwork ran through an unheated garage without insulation.
A licensed professional structural engineer then inspected the plaintiffs' three homes. He found the construction demonstrated a lack of skill on the part of the tradesmen carrying out the framing. The inaccuracy of the cutting, the failure to check floor levels as they went along, the missing or misplaced piers, all showed a lack of attention to the blueprints or an inability to read them. This, he opined, was a case of second or third-class workmanship exacerbated by the use of poor quality materials. Green lumber and lumber of lower species was substituted for that called for by the architect in the drawings and no evidence of any grade stamp indicating kiln-dried lumber was found as called for.
The framer used support beams smaller in size and fewer in number than those called for in the blueprints. Failure to use sufficient supporting beams in the trusses and in the main supporting beam caused undue stress on the attic rafters which, under full snow loads, would become overloaded and would sag. In the Mathews home, a support post that was supposed to go *531 from the roof framing of the family room to the basement was missing, causing the family room roof to sag. The floors in these homes were uneven because support beams were missing. A support beam which was to be reenforced with steel was omitted in all of these homes. Sloping floors were caused by the failure of the framer to provide double supports as called for. In the Gennari house, the failure to double every third joist resulted in furniture visibly leaning at an angle and caused the ceiling in the living room to sag.
In the Nestor home, the framer set the main girder more than an inch too low relative to the exterior walls resulting in a noticeable slope in the floors. Any attempt to raise the girder to its proper level would cause cracking throughout the house and would affect the duct work and plumbing. In the Gennari house, a masonry pier supporting a main girder was too short. To make up the difference, mortar was placed between the girder and the pier with no moisture shield to separate the two. Moisture wicking out of the masonry eventually will cause the wood to rot.
A licensed architect and expert in wood frame construction inspected all four plaintiffs' homes and also found the framing to be poor. He further observed that there was no asphalt coating on the foundation walls below grade, allowing moisture to seep in through the block walls in the basement.
Richard Ings was the framer in the development. He was used by Rumberg in Holmdel in 1986. He had two crews at Squire's Runne but was not personally there in 1986 and 1987 because he was remodeling the Rumbergs' home in Spotswood and he let his lead carpenter supervise the framing job. After he completed the Rumbergs' house, he returned to Squire's Runne but could not recall which house he began working on. He claimed to have examined his supervisor's work, done in his absence, and found it to be satisfactory. Ings wanted to do all the framing in Douglas fir but Rumberg refused, as he wanted to use less expensive hem fir. Ings had never before used hem fir on a framing job. He acknowledged that it was he who suggested that certain aspects of *532 the framing deviate from the architectural plans. It was his opinion the homes did not need four-ply beams; and two-by-eights would do just as well as two-by-tens.
Rumberg acknowledged that although he intended to provide the plaintiffs with quality construction, he was unable to do so because of personal problems and because he relied on contractors, as well as a super, who did not do their jobs correctly. Rumberg left many responsibilities to his super, whose previous experience was as a mason, not as a superintendent of construction. Rumberg admitted that his superintendent was so incompetent that he was forced to fire him in the summer of 1987. However, he had been aware of his super's mistakes six to eight months earlier.
Thomas Glick was manager of the East Brunswick Weichert office and dealt directly with Rumberg on both the Holmdel and Squire's Runne development. Richard Albrecht was Weichert's regional vice president. They testified that it was company policy to accept the representations of a builder with respect to his credentials and experience, and no one was responsible for verifying information received from a builder. Further, there was no monitoring of what sales representatives were telling customers. Glick had dealings with Rumberg from Holmdel and knew that his involvement in other developments was only in conjunction with other builders. He also knew that his experience was less than the ten years represented in the article Weichert ran to advertise the development.
Plaintiffs seek to hold Weichert, the real estate broker, liable for treble damages under the Consumer Fraud Act (Act) for making an affirmative misstatement concerning the experience and qualifications of the builder-developer, Rumberg, where that misstatement apparently originated with the builder, who had little or no prior experience as a developer and builder.
Our Supreme Court recently held that "real estate brokers, agents, and sales persons representing professional sellers of real estate are subject to the provisions of the Act." Strawn v. *533 Canuso, 140 N.J. 43, 60, 657 A.2d 420 (1995) (citing Arroyo v. Arnold Baker & Assoc. Inc., 206 N.J. Super. 294, 297, 502 A.2d 106 (Law Div. 1985)). N.J.S.A. 56:8-2 prohibits certain conduct in connection with the sale or advertisement of merchandise or real estate, by providing that:
The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such a person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice; ....
This provision is to be liberally construed in favor of consumers. Cox v. Sears Roebuck & Co., 138 N.J. 2, 15, 647 A.2d 454 (1994); Barry v. Arrow Pontiac, Inc., 100 N.J. 57, 69, 494 A.2d 804 (1985); Levin v. Lewis, 179 N.J. Super. 193, 200, 431 A.2d 157 (App.Div. 1981); State v. Hudson Furniture Co., 165 N.J. Super. 516, 520, 398 A.2d 900 (App.Div. 1979). It was enacted to protect the public from sharp practices and dealings in the marketing of merchandise and real estate which could victimize the public by luring the consumer into a purchase through fraudulent, deceptive, or similar kinds of selling or advertising practices. Strawn v. Canuso, 271 N.J. Super. 88, 108, 638 A.2d 141 (App.Div. 1994), aff'd, 140 N.J. 43, 657 A.2d 420 (1995), (citing Daaleman v. Elizabethtown Gas Co., 77 N.J. 267, 271, 390 A.2d 566 (1978)). The Act is broadly designed to protect the public, even when the merchant acts in good faith. D'Ercole Sales, Inc. v. Fruehauf Corp., 206 N.J. Super. 11, 23, 501 A.2d 990 (App.Div. 1985); Skeer v. EMK Motors, Inc., 187 N.J. Super. 465, 467, 455 A.2d 508 (App.Div. 1982). A person who commits "an unconscionable commercial practice" violates the Act. The standard of conduct that the term "unconscionable" implies is a lack of "good faith, honesty in fact and observance of fair dealing." Kugler v. Romain, 58 N.J. 522, 544, 279 A.2d 640 (1971). Our courts have made it plain that a simple breach of warranty or breach of contract is not per se unconscionable and alone does not violate the Act. DiNicola v. *534 Watchung Furniture's Country Manor, 232 N.J. Super. 69, 72, 556 A.2d 367 (App.Div.), certif. denied, 117 N.J. 126, 564 A.2d 854 (1989); D'Ercole Sales, supra, 206 N.J. Super. at 25, 501 A.2d 990.
Unconscionable practices fall into two general categories under N.J.S.A. 56:8-2, affirmative acts and knowing omissions. Strawn, supra, 271 N.J. Super. at 108, 638 A.2d 141. The distinguishing feature between unlawful practices categorized as affirmative acts and those categorized as knowing omissions is the requirement of the element of intent. The Act permits a finding that it was violated, and the consequent imposition of treble damages and attorney's fees (pursuant to N.J.S.A. 56:8-19), without any showing of an intent to deceive or even negligence on the part of the seller of merchandise or real estate where the representation is affirmative. However, when the wrong that is alleged consists of an omission or a failure to disclose, the plaintiff must show that the defendant acted with knowledge, as intent is an essential element of that type of fraud. Cox v. Sears Roebuck & Co., supra, 138 N.J. at 17, 647 A.2d 454; Chattin v. Cape May Greene, Inc., 243 N.J. Super. 590, 603, 581 A.2d 91 (App.Div. 1990), aff'd o.b., 124 N.J. 520, 591 A.2d 943 (1991).
Weichert asserts that, here, the trial judge mistakenly interpreted N.J.S.A. 56:8-2 as not requiring a knowledge or intent element where an affirmative misrepresentation is found to have been made. Weichert insists that a broker cannot be held liable for a misrepresentation of fact without proof of knowledge of the falsity of the representation, claiming the Legislature could never have so intended.
Neither the statutory language nor our case law support defendant's position. Where a broker or merchant makes an affirmative misrepresentation of material fact, the Act does not require a showing of knowledge of falsity or intent to deceive in order to hold the offender liable to the purchaser. Strawn v. Canuso, supra, 140 N.J. at 60, 657 A.2d 420; Cox v. Sears Roebuck & Co., supra, 138 N.J. at 17-18, 647 A.2d 454; Chattin v. Cape May Greene, Inc., supra, 124 N.J. at 522, 591 A.2d 943.
*535 Defendant then argues that to uphold the trial court's application of the Act in this case would impose liability and the consequential treble damages and counsel fees upon a broker for "any erroneous statement, regardless of its source and regardless of the bona fides of the broker." Consequently, defendant urges that we interpret the statute and define misrepresentation according to its common law elements, thereby disregarding the clear statutory language.
We decline to do so. Not just "any erroneous statement" will constitute a misrepresentation prohibited by N.J.S.A. 56:8-2. The misrepresentation has to be one which is material to the transaction and which is a statement of fact, found to be false, made to induce the buyer to make the purchase. This differs significantly from common law legal fraud or misrepresentation for which there are five necessary elements: (1) material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages. The Jewish Center of Sussex Cty. v. Whale, 86 N.J. 619, 624-25, 432 A.2d 521 (1981); Van Dam Egg Co. v. Allendale Farms, Inc., 199 N.J. Super. 452, 456-57, 489 A.2d 1209 (App.Div. 1985). The Act dispenses with all of the common law elements except the first.
We cannot say this is unreasonable legislation. Indeed, Wisconsin through common law has imposed liability against real estate brokers for misrepresentation where the plaintiff can show: (1) that the defendant made a factual representation; (2) the factual representation was untrue; (3) the plaintiff believed the statement to be true and relied on it to his or her detriment; (4) defendant made the representation professing or implying personal knowledge, concerning a matter about which he or she purported to have knowledge; and (5) the defendant had an economic interest in the transaction. Gauerke v. Rozga, 112 Wis.2d 271, 332 N.W.2d 804, 807-09 (1983); Grube v. Daun, 173 Wis.2d 30, 496 N.W.2d 106, 114-15 (1992), review denied, 497 N.W.2d 130 (Wis. 1993); *536 Reda v. Sincaban, 145 Wis.2d 266, 426 N.W.2d 100, 102, review denied, 146 Wis.2d 875, 430 N.W.2d 918 (1988).
In Illinois, also, prior to a 1982 amendment to its Consumer Fraud Act, its Consumer Fraud Act tracked nearly verbatim the language of N.J.S.A. 56:8-2. Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, Ill. Rev. Stat. ch. 121 1/2, para. 262 (1989), provided, in pertinent part, that
the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact ... in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.
The Illinois courts, as we do here today, interpreted that provision literally, and imposed upon brokers liability for material misrepresentations regardless of the broker's knowledge of the statement's falsity or whether the falsity was easily discoverable by the purchaser. Beard v. Gress, 90 Ill. App.3d 622, 46 Ill.Dec. 8, 413 N.E.2d 448 (1980); Duhl v. Nash Realty, Inc., 102 Ill. App.3d 483, 57 Ill.Dec. 904, 429 N.E.2d 1267 (1981); Buzzard v. Bolger, 117 Ill. App.3d 887, 73 Ill.Dec. 140, 453 N.E.2d 1129 (1983).
In response, in 1982, the Illinois Legislature amended its Consumer Fraud Act so that it would not apply to
communication of any false, misleading or deceptive information, provided by the seller of real estate located in Illinois, by a real estate salesman or broker licensed under "The Real Estate Broker License Act," unless the salesman or broker knows of the false, misleading or deceptive character of such information. This provision shall be effective as to any communication, whenever occurring.
[Ill. Rev. Stat. ch. 121 1/2, para. 270b(4) (1989).]
The statute as amended required that the element of knowledge be placed in the equation when considering liability based on real estate broker misrepresentations.
Unless our Legislature acts in a similar fashion, real-estate-broker defendants in this State are faced with the clear language of N.J.S.A. 56:8-2, which makes a real estate broker strictly liable for any material misrepresentation of fact he or she makes to a purchaser. Such conduct is an unlawful practice under our Act, *537 and defendant's argument lies not with the courts but with the Legislature.
Defendant alternatively urges that to uphold the trial court's finding of liability against it "for innocently repeating to the buyers what the seller said" exposes defendant to treble damages which would amount to more than $3 million including attorney's fees. Such a result, according to defendant, offends the due process clauses of both the federal and state constitutions and renders application of N.J.S.A. 56:8-19 unconstitutional. Defendant cites two United States Supreme Court cases, Browning-Ferris v. Kelco Disposal, 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989) and St. Louis, I.M. & S.R. Co. v. Williams, 251 U.S. 63, 40 S.Ct. 71, 64 L.Ed. 139 (1919) for the proposition that, when a penalty is so severe that it is wholly disproportionate to the offense, it is an unconstitutional violation of the Fourteenth Amendment. Neither of these cases support defendant's contention.
Browning-Ferris, supra, did not deal with the impact of due process requirements upon punitive damage awards, and the Court expressly stated that due process considerations would not be addressed because petitioners failed to raise it below. 492 U.S. at 276-77, 109 S.Ct. at 2920, 106 L.Ed.2d at 239. At issue was whether the excessive fines clause of the Eighth Amendment applies to awards of punitive damages in cases between private parties, and the Court held that it did not. 492 U.S. at 259, 280, 109 S.Ct. at 2912, 2923, 106 L.Ed.2d at 228, 241.
In St. Louis, supra, an Arkansas statute regulating railroad passenger rates provided that whenever a railroad company overcharged its customers it would be subject to a penalty of not less than $50 nor more than $300, plus costs and attorney's fees. 251 U.S. at 64, 40 S.Ct. at 72, 64 L.Ed. at 139. The petitioner railroad company overcharged two customers $.66, and was prosecuted for the overcharge and required to pay a penalty of $75 plus costs and attorney's fees for each of the two incidents. The railroad unsuccessfully *538 appealed to the Arkansas Supreme Court arguing a violation of the due process clause of the Fourteenth Amendment.
It was equally unsuccessful in the United States Supreme Court. 251 U.S. at 64, 40 S.Ct. at 72, 64 L.Ed. at 140. The Court explained that the Fourteenth Amendment
places a limitation upon the power of the states to prescribe penalties for violations of their laws . .. but always with the express or tacit qualification that the states still possess a wide latitude of discretion in the matter, and that their enactments transcend the limitation only where the penalty prescribed is so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable.
[251 U.S. at 66-67, 40 S.Ct. at 73, 64 L.Ed. at 141.]
The Court acknowledged that the statutory maximum penalty of $100., when contrasted with the $.66 overcharge "seems large; but, as we have said its validity is not to be tested in that way."
When it is considered with due regard for the interests of the public, the numberless opportunities for committing the offense, and the need for securing uniform adherence to established passenger rates, we think it properly cannot be said to be so severe and oppressive as to be wholly disproportioned to the offense or obviously unreasonable.
[Ibid.]
The driving force behind the treble damages penalty in our Act was the Legislature's paramount interest in protecting the public. Achieving that protection in its view required the imposition of severe penalties for violating the Act's provisions. The penalty provision of the Act, being only three times the amount of damages incurred by the purchaser, does not violate due process as applied by the Court in St. Louis, supra.
Weichert also maintains that the trial judge's fact-findings are insufficient. It contends that he failed to find which misrepresentations were made to plaintiffs and how they were damaged thereby, that the judge made inadequate findings as to credibility, failed to state which of plaintiffs' statements he believed and failed to apply a heightened standard of proof, namely, clear and convincing evidence.
The judge did not structure his opinion so as to separately delineate the misrepresentations made by Weichert to plaintiffs. *539 Rather, he summed up his findings with the statement that plaintiffs, "in essence, ... were led to believe that Rumberg was an exacting and demanding builder of real substance. They were misled." The record supports a finding that misrepresentations to that effect were made to plaintiff Gennari by Nancy Healy, a Weichert agent, who told her that Rumberg was one of the best builders in New Jersey and that he had built hundreds of homes, and was noted for detail and craftsmanship. Healy described to Gennari, Rumberg's quality control and spoke of his excellent craftsmanship.
Similarly, the Mathews dealt with Weichert agent Ruth Skonieczny who told them that Rumberg had built hundreds of homes, that she had worked with him personally and knew that he was dedicated to quality workmanship, was very experienced, paid a premium for quality craftsmanship and brought the same workers with him from job to job. She described Rumberg as the builder of the development in Mendham.
The Nestors learned of Squire's Runne through newspaper advertisements and a brochure published by Weichert which had only Weichert's name connected with this project. This was followed by a meeting with both Rumbergs, during which Ellen Rumberg, a Weichert representative, asserted that Weichert supported her husband one hundred percent, that his customers loved him and still called him.
The LaChapelles also learned of the project from newspaper advertisements of Weichert listings. They purchased after meeting with Ellen Rumberg who promoted her husband's high quality of workmanship, that he had been in business for over ten years, and his having built over a hundred homes in developments in Holmdel, Mendham and Livingston.
These statements are found in the court's recitation of the "pertinent testimony received from the plaintiffs during the course of the trial." The court made credibility findings in plaintiffs' favor, when it noted that although in some instances plaintiffs had embellished or overstated the case, "this is not so with regard to *540 the material representations that were made to them by Weichert so as to induce them to purchase at Squire's Runne." The court accepted plaintiffs' testimony about the material misrepresentations made to them by Weichert and found their testimony credible.
Weichert agents' affirmative statements of fact as to Rumberg's reputation, experience, and qualifications were untrue. Testimony from both Rumberg and Rumberg's brother-in-law, Philip Kayne, entirely refuted these representations, as the judge explicitly found in his opinion. The judge found that Rumberg was not even an adequate builder. His work was acceptable when supervised and controlled by a real builder such as his brother-in-law, but when on his own, he demonstrated a gross lack of ability evidenced first by the difficulties in the Holmdel project, followed by greater difficulties in the Squire's Runne development.
The record amply demonstrates that although Rumberg had been employed by Kayne since 1978, he had little responsibility for construction until 1981, with the commencement of the development known as Barnside at Mendham. At that time, he was an overseer, supervised by Kayne, the actual builder. At Holmdel, a small project by a corporation founded by Rumberg and Kayne, Kayne also supervised the work. The only building Rumberg did on his own was the failed Squire's Runne development.
The trial judge found that when Rumberg began Squire's Runne, for the most part his crews and his subcontractors were people with whom he had never previously dealt. His superintendent was not experienced as a supervisor. He was a mason Rumberg had used at Holmdel where there had been problems with wet basements for which he was responsible. The siding subcontractor had simply driven by the site, indicated he could do the work, and he was hired. His framer was not on the job to supervise his crew because he was working on Rumberg's home and the faulty heating and air conditioning systems were installed by non-professionals.
*541 The court's findings and conclusions are based on sufficient, substantial, credible evidence in the record, and indeed any other finding could not stand. Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974).
Weichert next raises as plain error, an issue regarding the standard of proof required to establish a violation of the Act. It contends on appeal, for the first time, that the standard should be the same as that for common law fraud, clear and convincing evidence, rather than the usual civil standard  preponderance of the evidence. No reported appellate decision in this State has squarely dealt with the issue. See Hyland v. Aquarian Age 2,000, Inc., 148 N.J. Super. 186, 191, 372 A.2d 370 (Ch.Div. 1977) (holding preponderance of evidence standard applicable). We find no indication that the Legislature intended to impose any greater burden of proof than that usually required in a civil action. In any event, we have held that although the party asserting a fraud bears the burden of proving it by clear and convincing evidence, "a trial judge should not be overruled in his finding if it is supported by substantial and credible evidence." Rova Farms, supra, 65 N.J. at 484, 323 A.2d 495; Stochastic Decisions v. DiDomenico, 236 N.J. Super. 388, 395, 565 A.2d 1133 (App.Div. 1989), certif. denied, 121 N.J. 607, 583 A.2d 309 (1990). In the present case, the findings of affirmative misrepresentations of material fact are supported by substantial, credible evidence in the record. Moreover, as we have demonstrated, the evidence not only preponderated, it was clear and convincing.
Weichert, however, correctly contends that it is entitled to contribution by Allen Rumberg, who was found by the trial court to have been negligent, in breach of his contracts with the plaintiffs and in violation of the Act. Although Weichert argues to this court that the Comparative Negligence Act, N.J.S.A. 2A:15-5.2 applies, its cross-claims for contribution filed in all four of its answers specifically referred to the New Jersey Joint Tortfeasors Act. See Joint Tortfeasor Contribution Act, N.J.S.A. 2A:53A-1 to 2A:53A-5.
*542 In Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 444-46, 625 A.2d 1110 (1993), our Supreme Court imposed a duty upon real estate brokers to undertake reasonable inspections and to warn of hazards to the safety of prospective buyers and visitors who tour an open house. Significant to the issue here, Justice Handler explaining that imposition of this duty would not be an unreasonable economic strain on a broker's livelihood, observed:
A broker may still retain a right of either contribution or indemnification from the homeowner, in the case of shared liability for a visitor's injury. N.J.S.A. 2A:53A-1 to -4; See Holloway v. State, 125 N.J. 386, 400-03, 593 A.2d 716 (1991); Cartel Corp. v. Fireco, 81 N.J. 548, 565-70, 410 A.2d 674 (1979); Adler's Quality Bakery, Inc. v. Gaseteria, 32 N.J. 55, 77, 159 A.2d 97 (1960). Moreover, principles of comparative negligence also serve to distribute the costs and burdens of accidental injury among all involved parties. N.J.S.A. 2A:15-5.1 to -5.3. `Liability for resultant injury should mirror the responsibilities of the participants and be apportioned in accordance with their combined fault.' Renz [v. Penn Cent. Corp.,] supra, 87 N.J. [437] at 546, 435 A.2d 540 [1981].
[Id. at 447, 435 A.2d 540.]
Further, this court has ordered contribution between a home seller, real estate broker and an exterminating company found to be joint tortfeasors. Neveroski v. Blair, 141 N.J. Super. 365, 385-86, 358 A.2d 473 (App.Div. 1976).
Here, Rumberg's affirmative misrepresentation of his experience and qualifications as a builder were at least a cause of Weichert's misrepresentations, and Rumberg's direct misrepresentations and breach of contract were the direct and proximate cause of the damages suffered by plaintiffs.
All of the plaintiffs, except the LaChapelles, spoke with a Weichert representative and met with Rumberg before they entered into contracts for sale. While Weichert's representatives asserted that Rumberg had built hundreds of homes, was timely and used quality materials and workmen, Rumberg reenforced these assertions. He represented that he had built hundreds of homes and that he had excellent qualifications, experience and expertise in homebuilding, that he took care in building his homes, used quality craftsmanship achieved through people whom he had worked with before, and that within three to four months of *543 signing the contracts of sale, their homes would be completed. Ellen Rumberg supplemented her husband's assertions saying that all of his customers loved him and that Weichert supported Rumberg one hundred percent. Ellen showed a photo album of homes which she claimed were homes her husband built. She talked about the quality of his construction, his attention to detail, his use of quality materials and experienced workers. She stated that her husband built his homes within four months.
The LaChapelles met with Rumberg before signing the contract to go over the blueprints of their home and to discuss possible changes. He presented himself to the LaChapelles and stated that they would be in their home by March of 1987, a period of about six months from their first review of the blueprints with him. Even if Rumberg made no assertions to the LaChapelles concerning his builder's qualifications, they signed the contract four days after meeting with him to go over the blueprints which he agreed to customize for them, and he represented they would be in the home by March.
Despite the judge's conclusion that "none of the plaintiff purchasers would have entered into purchase contracts on the basis of representations from an unknown builder from North Jersey," it was plaintiffs' meetings with the builder and his claims as to his experience and qualifications for building their home which led to their signing contracts of sale.
The trial judge found that Rumberg made affirmative misrepresentations to all of the plaintiffs but refused to hold him liable because he was not "an efficient or proximate cause of the plaintiffs' damages." This ruling was in error. It was the concurrence of the misrepresentations of both the broker and the builder which caused plaintiffs to enter into contracts with Rumberg's company. More importantly, it was the failure of Rumberg to adequately perform his contract obligations that caused plaintiffs' damages and losses. He and his company must, therefore, be held jointly liable with Weichert and Weichert is entitled to indemnification to the full extent of its liability for damages, as *544 Rumberg and his company were the direct cause of plaintiffs' losses and Weichert's losses as well.
Weichert next contends that three of the four plaintiffs are not entitled to claim the protection of the Act because they each conducted independent investigations into the builder's qualifications prior to entering into contracts and, therefore, they cannot claim to have relied on anything said or done by Weichert which resulted in their damages. We reject this contention.
The plain language of N.J.S.A. 56:8-2, with respect to violations of the Act by affirmative misrepresentations, makes it clear that it does not matter whether "any person has in fact been misled, deceived or damaged thereby." Proof of an affirmative misrepresentation of a fact material to the transaction is sufficient to establish a violation of the act.
In Strawn v. Canuso, supra, 271 N.J. Super. at 106, 638 A.2d 141, we rejected the argument that plaintiffs should have been charged with constructive knowledge of the existence of a landfill which abutted the development because its existence was so open and notorious, where plaintiffs charged defendants with failing to disclose the existence of that landfill. We stated that the doctrine of constructive knowledge cannot "serve as a shield of protection from accountability for one who makes false representations to another's damage," quoting O'Leary v. Industrial Park, 14 Conn. App. 425, 542 A.2d 333, 337 (1988). In the present case, there was no requirement that these purchasers investigate the qualifications and experience of the builder because they were entitled to rely upon the broker's representations about the builder.
Moreover, the results of these plaintiffs' independent investigations gave them no reason to think they should not rely on the broker's representations. Gennari asked Healey, a Weichert agent, to visit Mendham and report back to her. Healey's glowing report of the quality of the construction and nature of the development gave Gennari no indication that she should look any farther or should disregard what she had been told about the builder. *545 The Nestors went to Mendham to the area Ellen Rumberg directed them. They met only a subsequent purchaser who had no idea who built the house and did not know Rumberg. They took a tour of that home and saw how beautiful it was, confirming in their mind that only a top builder could have built that home. The LaChapelles also went to Mendham and spoke to a homeowner, who showed them around the house indicating that she was pleased with it. When Mrs. LaChapelle asked if she had ever heard of Allen Rumberg she said that she knew the name, but that the person she dealt with during construction was Phil. The following day, when she asked Ellen who Phil was, Ellen explained that he was the superintendent on the job and was Allen's brother-in-law. They also went to a home in Holmdel, but found no one in. A landscaper said he heard the owners were unhappy, but it had to do with a banister. Difficulty with a banister is so minor a problem that a reasonable person's suspicions would not cause further inquiry.
Thus, we reject Weichert's claims that plaintiffs' independent investigations barred them from asserting a claim under the Act against Weichert. They obtained no knowledge to permit even an inference that they knew of the falsity of the representations made by defendants.
Weichert next contends that plaintiffs, Gennari, Nestor and LaChapelle, further waived their claims against Weichert when they accepted delivery of a deed, at closing. According to Weichert, these three plaintiffs knew that the representations made by Weichert concerning Rumberg's quality as a builder were not true, but they nevertheless elected to close title. Weichert relies on two New Jersey cases, neither of which are factually on point  Lembeck v. Gerken, 86 N.J.L. 111, 90 A. 698 (Sup.Ct. 1914) and Deerhurst Estates v. Meadow Homes, Inc., 64 N.J. Super. 134, 165 A.2d 543 (App.Div. 1960), certif. denied, 34 N.J. 66, 167 A.2d 55 (1961).
In Deerhurst Estates, supra, we held that the plaintiff had not waived any rights and we set out the state of the law with respect *546 to waiver and fraudulently induced contracts based on misrepresentations:
In the instance of a fraudulently induced contract, a knowing misstatement has been made, on the basis of which the defrauded party signs the instrument. Assuming that the contract is still executory when knowledge of the fraud is obtained, the majority view requires the defrauded party either to affirm the contract or to rescind it. See Annotation, 13 A.L.R.2d 807, 856 (1950). The theory behind this position is that if the defrauded party chooses to proceed with the contract as it stands, he has suffered no injury by reason of the fraud. Lembeck v. Gerken, 86 N.J.L. 111, 117 [90 A. 698] (Sup.Ct. 1914). Rather than allow the injured party "to speculate upon the fraud of the other party * * * [and] recover for self-inflicted injuries * * *," the law concludes that he has waived his right to damages for the fraud. Thompson v. Libby, 36 Minn. 287, 31 N.W. 52 (Sup.Ct. 1886). An alternative theory is that the decision to proceed with performance in the face of the fraud amounts to the making of a new contract. Simon v. Rossier, 127 A.2d 394, 395 (D.C.Mun.Ct.App. 1956). An exception to this rule may apply where the defrauded party is unable to rescind without prejudice. See Thompson Crane & Trucking Co. v. Eyman, 123 Cal. App.2d 904, 267 P.2d 1043, 1047 (D.Ct.App. 1954).
[Id. at 144, 165 A.2d 543 (emphasis added).]
Here, the record demonstrates that these plaintiffs could not have rescinded their contracts by refusing to close, without severe prejudice. In addition, it is clear that although plaintiffs could have rescinded their contracts at grave financial risk, their realization of how poorly their homes were constructed and, thus, how seriously Rumberg's qualifications as a builder were misrepresented to them, did not occur until after they took possession of the homes and lived in them. Plaintiffs were assured by Weichert and Rumberg that the homes would be completed as contracted for and were given explanations for the delays they faced. Moreover, none of the plaintiffs was able to have meaningful inspection of their homes during the construction process because the road to the lots was impassable and they were ordered not to go onto their homesites during construction by Rumberg, who paid a guard to keep plaintiffs out of the area.
Plaintiffs did not have such knowledge of the fraud perpetrated upon them by Weichert and Rumberg as would have required them to either affirm the contract or rescind it. In any event, the circumstances presented made it apparent that rescinding the *547 contract would have greatly prejudiced these plaintiffs. Deerhurst Estates, supra, 64 N.J. Super. at 144, 165 A.2d 543.
Weichert then maintains that it is not vicariously liable as a matter of law for the consumer fraud of its agents and that punitive damages may not be assessed against it for the acts of its agents, citing Kugler v. Romain, 110 N.J. Super. 470, 266 A.2d 144 (Ch.Div. 1970), modified, 58 N.J. 522, 279 A.2d 640 (1971). We disagree.
The law in this State is that a principal may be held for damages resulting from his agent's fraudulent representation where the principal has put the agent in such a position that a person of ordinary prudence would be reasonably justified in the assumption that the agent has the authority to make the representation. Gardner v. Rosecliff Realty Co., 41 N.J. Super. 1, 9, 124 A.2d 30 (App.Div. 1956); Mesce v. Automobile Association of New Jersey, 8 N.J. Super. 130, 135, 73 A.2d 586 (App.Div. 1950). Our cases are consistent with the Restatement, (Second) of Agency (1958). Section 258 provides:
[i]n the absence of an exculpatory agreement, a principal authorizing a servant or other agent to enter into negotiations to which representations concerning the subject matter thereof are usually incident is subject to liability for loss caused to the other party to the transaction by tortious misrepresentations of the agent upon matters which the principal might reasonably expect would be the subject of representations, provided the other party has no notice that the representations are unauthorized.
Weichert's site agents, Ellen Rumberg and Ruth Skonieczny, made misrepresentations about Rumberg's experience and qualifications as a builder. These were matters which plaintiffs could reasonably believe had been within their purview to make. There was no testimony that the agents were instructed not to make representations about the builder, and in any event, plaintiffs had no reason to believe that these misrepresentations were unauthorized. See Restatement (Second) Agency § 258, comment a, supra, (principal's instructions to agent, to make no statements about horse given to agent to sell, would not relieve principal from liability for agent's fraudulent misstatements about the horse's age *548 or similar matters, because prospective purchaser may reasonably believe agent to have such authority).
Weichert, though, asserts that even if found vicariously liable through the acts of its agents, punitive damages may not be assessed against it. Weichert relies on Enright v. Lubow, 202 N.J. Super. 58, 493 A.2d 1288 (App.Div. 1985), certif. denied, 104 N.J. 376, 517 A.2d 386 (1986). We held there that punitive damages were improperly assessed against a title company for the negligent actions of its employee because none of the conditions or requirements set out in Restatement (Second) of Torts, § 909 (1977), were satisfied. § 909 provides that punitive damages can be awarded against a principal because of an agent's action only if (1) the principal authorized the act, or (2) the agent was unfit and the principal was reckless in employing or retaining the agent, or (3) the agent was acting in the scope of his or her own employment in a managerial capacity, or (4) the principal ratified the act. Id. at 82.
Comment a to Restatement, supra, § 909 reports that the identical provision is also found in the Restatement (Second) of Agency § 217C and, indeed, that is the case. However, comment c of Restatement (Second) of Agency § 217C contains a caveat not found in the Restatement (Second) of Torts, supra, provision. That comment cautions that "the rule stated in this Section does not apply to the interpretation of special statutes such as those giving triple damages, as to which no statement is made." (Emphasis Added).
We find nothing in our Act to suggest that a principal should not be subject to the treble damages provision of N.J.S.A. 56:8-19 under the facts of this case. The Act's plain language and its purposes lead us to hold that Weichert is liable for the fraudulent misrepresentation of its agents and is subject to the treble damages provision of the Act. Any lesser accountability would dilute the public protection sought by the Legislature.
Lastly, Weichert argues that plaintiffs' "breach of warranty claims" do not constitute a violation of the Act. It cites many *549 cases holding that an assertion of a breach of warranty was insufficient to sustain a cause of action under consumer fraud legislation. However, plaintiffs' claims against Weichert under the Act were for fraudulent misrepresentations, not breach of warranty, and it was for these fraudulent misrepresentations that Weichert was held liable under the Act.
Plaintiffs' cross-appeal contends that the trial court erred in dismissing their negligence counts against Weichert because they failed to adduce expert testimony to establish a broker's duty to ascertain the truth of positive statements made about a builder. However, we need not reach this issue in view of our affirmance of liability under the Act.
Plaintiffs also maintain that the trial judge erred in failing to hold Weichert liable for "foreseeable consequences, including interference with beneficial use and enjoyment of new homes arising from its tortious conduct." The judge denied plaintiffs' claims for damages for intentional and negligent infliction of emotional distress, finding plaintiff failed to establish that Weichert's conduct met the conditions required to support recovery of damages under those two theories.
No appellate court has passed on the question of whether non-economic damages are recoverable under the act. In 1979, the Law Division held that they are not. Jones v. Sportelli, 166 N.J. Super. 383, 391-92, 399 A.2d 1047 (Law Div. 1979). The Law Division held that the Act, with its treble damage award being in derogation of the common law, must be strictly construed, and interpreted it to authorize three-fold recovery only for any "ascertainable loss of monies or property." Id. at 391, 399 A.2d 1047.
We agree that such damages are not recoverable apart from a viable claim sounding either in negligence or intentional tort. Portee v. Jaffee, 84 N.J. 88, 101, 417 A.2d 521 (1980); Berman v. Allan, 80 N.J. 421, 433-34, 404 A.2d 8 (1979); Hume v. Bayer, 178 N.J. Super. 310, 314, 428 A.2d 966 (Law Div. 1981). We further hold that the trial judge correctly evaluated the evidence in *550 determining that plaintiffs failed to establish that Weichert's agents intentionally or negligently inflicted emotional distress upon them.
To establish a claim for intentional infliction of emotional distress, a plaintiff must first establish intentional and outrageous conduct by the defendant, that is, that defendant both intended to do the act and to produce emotional distress, and second the defendant's conduct must be shown to be "[s]o outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." Buckley v. Trenton Saving Fund Soc., 111 N.J. 355, 365-66, 544 A.2d 857 (1988), (quoting Restatement (Second) of Torts § 46 comment d (1965)). Further, the defendant's actions must be the proximate cause of the plaintiff's emotional distress and the emotional distress suffered by the plaintiff must be "so severe that no reasonable man could be expected to endure it." Ibid.
There is absolutely no proof that Weichert acted intentionally to misrepresent the builder's qualifications and to thereby produce emotional distress in plaintiffs. Even if it could be said that Weichert's conduct reached the level of outrageousness required by our courts, there is no evidence plaintiffs suffered emotional distress "so severe that no reasonable man could be expected to endure it." Buckley v. Trenton Saving Fund Soc., supra, 111 N.J. at 366, 544 A.2d 857. As for negligent infliction of emotional distress, there was neither the kind of physical injury nor the resulting severe emotional distress required to recover under that theory. Frame v. Kothari, 115 N.J. 638, 643, 560 A.2d 675 (1989). Therefore, the judge properly dismissed plaintiffs' claims for emotional distress on the ground that plaintiffs failed to establish the required elements.
In their final point, plaintiffs urge that the evidence established common-law fraud justifying the imposition of punitive *551 damages upon Weichert and both Allen and Ellen Rumberg. We agree as to the Rumbergs, but disagree as to Weichert.
The trial court found that common-law fraud was not a viable theory against Weichert because it was not satisfied that plaintiffs established Weichert acted knowingly and with an intent to deceive plaintiffs. Plaintiffs failed to establish that "Weichert possessed the requisite awareness of the falsity of such statements to trigger a finding of common law fraud." However, the judge made no determination about the Rumbergs' liability to plaintiffs in common law fraud.
As set forth earlier in our opinion, common-law legal fraud consists of five elements: material misrepresentation of a presently existing or past fact; knowledge or belief by the defendant of its falsity; an intention that the other person rely on it; reasonable reliance thereon by the other person; and resulting damage. The Jewish Center of Sussex v. Whale, supra, 86 N.J. at 624-25, 432 A.2d 521; Van Dam Egg Co. v. Allendale Farms, supra, 199 N.J. Super. at 456-57, 489 A.2d 1209. Plaintiffs' contention that Weichert, in fact, knew the representations its agents were making about Rumberg's experience and qualifications as a builder, as well as about the types of materials that would be used in their homes, were false can be supported only by way of the vicarious knowledge of its agents, Ellen Rumberg and Ruth Skonieczny.
Assuming Weichert's knowledge is coextensive with that of its agents, under a vicarious liability theory, the one question we need address is whether the misrepresentations warrant the imposition of punitive damages, as under the Act plaintiffs will receive their full compensatory damages. Weichert's agents knew Rumberg's true background and experience. Ellen was Rumberg's wife and Ruth worked for him at Holmdel and must have known he was not the builder there, but was rather in partnership with his brother-in-law. She also knew of all the problems with all four Holmdel residences. If this knowledge is imputed to Weichert, its liability under common-law fraud may be established, but the question of whether this conduct rises to a level justifying the imposition of punitive damages is quite different.
*552 Punitive damages are awarded in exceptional cases as a punishment of the defendant and as a deterrent to others from following his or her example. DiGiovanni v. Pessel, 55 N.J. 188, 190, 260 A.2d 510 (1970). Our Supreme Court has described the type of conduct warranting the imposition of punitive damages:
To warrant a punitive award, the defendant's conduct must have been wantonly reckless or malicious. There must be an intentional wrong doing in the sense of an "evil-minded act" or an act accompanied by a wanton and wilfull disregard of the rights of another.
[Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 49, 477 A.2d 1224 (1984).]
To satisfy the requirement of wilfulness there must be a "positive element of conscious wrongdoing," which requirement may be satisfied upon a showing of a deliberate act or omission made with knowledge of a high degree of probability of harm and reckless indifference to consequence. Berg v. Reaction Motors Div., 37 N.J. 396, 414, 181 A.2d 487 (1962). The wrongfulness of an intentional act, a "wrongful motive," is the key to the right to punitive damages. Nappe, supra, 97 N.J. at 49, 477 A.2d 1224.
Something more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or "malice," or fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interest of others that his conduct may be called wilful or wanton. Lacking this element, mere negligence, however "gross" is generally held not to be enough.
[DiGiovanni v. Pessel, supra, 55 N.J. at 190, 260 A.2d 510, quoting W. Prosser, Handbook on the Law of Torts, § 2, at 9-10 (2d ed. 1955).]
Accord, Parks v. Pep Boys, 282 N.J. Super. 1, 16-18, 659 A.2d 471 (App.Div. 1995). We cannot conclude that Weichert's corporate culpability was so wanton and willful as to warrant an award of punitive damage at common law. Such an award would expose Weichert to a multitude of damages well beyond the Act.
Although we cannot say that the conduct of Weichert warrants it, that of Ellen and Allen Rumberg did rise to a level that warrants the imposition of punitive damages. The sole purpose for their misrepresentations to plaintiffs was to get them into the development, take their money, and make a profit, without regard to the consequence that plaintiffs would have to *553 live in homes built by inexperienced and careless subcontractors. The Rumbergs promised plaintiffs they were purchasing homes built by an experienced, careful, quality-demanding builder, Allen Rumberg. The record overwhelmingly establishes they received just the opposite.
The key to punitive damages is the wrongfulness of the intentional act. The Rumbergs' motives were pecuniary gain with total indifference to the consequences to plaintiffs. They had knowledge that their failure and inability to live up to the promises and representations they were making to plaintiffs would result in a high probability of harm to them. The record compels the conclusion that more than a breach of contract occurred here. The Rumbergs' conduct satisfies the requirements for the imposition of punitive damages.
We affirm the Law Division's imposition of liability upon Weichert under the Consumer Fraud Act. We reverse the dismissal of plaintiffs' claims in common-law fraud and under the Consumer Fraud Act against Allen Rumberg and Ellen Rumberg, and allow consideration of the award of punitive damages as to both Rumbergs.